ENTERGY ARKANSAS, INC., an Arkansas corporation; Entergy Gulf States, Inc., a Texas corporation; Entergy Louisiana, Inc., a Louisiana corporation; Wolf Creek Nuclear Operating Corporation, a Delaware corporation; Omaha Public Power District, a public corporation and political subdivision of the State of Nebraska, Plaintiffs,

Central Interstate Low–Level Radioactive Waste Commission, Realigned Plaintiff,

US Ecology, Inc., a California corporation, Intervenor–Plaintiff,

v.

STATE OF NEBRASKA; Nebraska Department of Environmental Quality; Randolph Wood, individually and in his official capacity; Jay Ringenberg, individually and in his official capacity; Nebraska Department of Health and Human Services Regulation & Licensure; David P. Schor, individually and in his official capacity; Cheryl Rogers, individually and in her official capacity; and John Doe, Jane Doe and Doe Companies 1 through 20, individually and in their official capacities, Defendants.

No. 4:98CV3411.

United States District Court,
D. Nebraska.

April 16, 1999.

John P. Heil, Thomas E. Johnson, Patrick J. Ickes, Baird, Holm Law Firm, Omaha, NE, Stephen M. Bruckner, Joseph E. Jones, Fraser, Stryker Law Firm, Omaha, NE, for plaintiffs.

Alan E. Peterson, Shawn D. Renner, Cline, Williams Law Firm, Lincoln, NE, for realigned plaintiffs.

Steven G. Seglin, Rocky C. Weber, Crosby, Guenzel Law Firm, Lincoln, NE, Leonard B. Levine, Los Angeles, CA, Rene M. Devlin, Laurence H. Levine, Latham, Watkins Law Firm, Chicago, IL, for intervenor-plaintiffs.

Linda L. Willard, Attorney General's Office, Lincoln, NE, Annette M. Kovar, Nebraska Dept. Of Environmental, Quality, Lincoln, NE, John L. Wittenborn, William Bradford Reynolds, Collier, Shannon Law Firm, Washington, DC, for defendants.

## Memorandum and Order

KOPF, District Judge.

The defendants took eight years to say "no" to an application to construct a low-level radioactive waste disposal site. In the process, they required the plaintiffs to spend more than $74 million. A large portion of that huge sum went directly to Nebraska. There is good reason to think that the license denial was politically preordained.

In what may be the ultimate expression of "chutzpah," the defendants want millions more from the plaintiffs to defend this lawsuit. They also seek to force some of the plaintiffs to participate in and fund an administrative hearing. The defendants make this demand though those plaintiffs, as the parties entitled to the review, do not wish to go on with or pay for that hearing. The plaintiffs assert that I should maintain the status quo until deciding the fundamental question of whether Nebraska has violated its federal obligation under an interstate compact to exercise good faith when dealing with the waste disposal application.

Agreeing with the plaintiffs, I now issue a preliminary injunction against the defendants. In short, the defendants will have to pay for their own defense, and the administrative hearing will be stayed, until the much broader and more fundamental question of good faith can be answered.

### I. Background

This case is not about the parochial interests of the State of Nebraska or its politicians. On the contrary, this matter presents serious questions regarding the supremacy of federal law and the national problem of low-level radioactive waste. In particular, and in addition to the legitimate concerns of Nebraska, the vital interests of at least four other states are at stake. As one reads on, this point should be remembered.

Pursuant to the United States Constitution,[1] and with the consent of Congress,[2] the States of Nebraska, Louisiana, Arkan-

---

1. U.S. CONST.ART. I, § 10, CL. 3.

2. OMNIBUS LOW-LEVEL RADIOACTIVE WASTE INTERSTATE COMPACT CONSENT ACT, Pub.L. No. 99–240, tit. II, sec. 222, 99 Stat. 1859, 1863 (1986).

sas, Oklahoma, and Kansas signed the Central Interstate Low–Level Radioactive Waste Compact ("Compact") to deal with low-level radioactive waste disposal concerns.[3] In so doing, Nebraska, which was chosen to be the host for the disposal site, agreed that "[e]ach party state has the right to rely on the good faith performance of each other party state." Compact, Art. III(f).

## A. The Parties and the Claims

Three categories of plaintiffs sue. The first category is the Central Interstate Low–Level Radioactive Waste Commission ("Commission"). The Commission, consisting of representatives from each state, was formed pursuant to the Compact. Compact, Art. IV. The Commission is charged with the responsibility of enforcing the terms of the Compact. It has the right to sue in federal court. Compact, Art. IV(e). More importantly, the Commission "shall ... [r]equire all party states and other persons to perform their duties and obligations arising under this compact by an appropriate action" in court. Compact, Art. IV(m)(8). The second category is U.S. Ecology, Inc. (USE). Pursuant to Art. V of the Compact, the Commission hired USE to select, develop, and operate the disposal site. The third category is generators of waste who want to use the proposed disposal site. They have paid much of the money to finance the application process. They include companies that operate nuclear plants producing electricity.

The defendants include the State of Nebraska, the state agencies that denied the application, the former directors of the state agencies that denied the application, and various other officials with those state agencies. The individual defendants are sued in their official and individual capacities.[4]

All the plaintiffs claim that Nebraska wrongly denied an application to construct a waste disposal site. The plaintiffs request damages, declaratory, and equitable relief. Among other things, the Commission seeks: (1) damages; (2) an accounting; (3) a declaration that Nebraska has violated the Compact, especially the "good faith" provision; (4) removal of Nebraska from the licensing process; and (5) the appointment of an impartial third party to complete the licensing process.

The Commission also joins with USE and the other plaintiffs in seeking a preliminary injunction prohibiting Nebraska from requiring them to pay Nebraska for defense of this suit. Like the other plaintiffs, the Commission also seeks to stop Nebraska from conducting an administrative hearing about the license denial and from billing the plaintiffs for related fees and costs.

## B. The Facts

Before stating the facts, three things must be kept in mind. First, the underlying facts are voluminous and complex. Second, we are at the very early stages of this litigation.[5] Third, a 13–hour evidentiary hearing on a motion for preliminary injunction is no substitute for a trial. With these caveats in mind, the facts pertinent to the question of injunctive relief appear as follows.

### The Beginning—1983 through 1988

In 1983, the Nebraska Legislature passed LB 200, which authorized Nebraska to enter into the Compact with the states of Arkansas, Louisiana, Oklahoma and Kansas. Generators of low-level nuclear waste have supported the Compact as the most cost-effective method for the development of a safe, reliable disposal

---

3. Codified in Nebraska law at Appendix § BB, Neb.Rev.Stat. Vol. 2A (Reissue 1989).

4. Except to the extent that equitable relief may involve them, the Commission makes no claim against the individual defendants.

5. No discovery has taken place in this case. However, in a 1993 proceeding USE discovered various "e-mail" messages and related documents from the Governor's office.

facility for waste within the Compact region.

In December 1987, the Commission selected the State of Nebraska as the host state for the low-level radioactive waste disposal facility. Shortly before this selection, Nebraska Governor Kay Orr had publicly announced ten conditions for Nebraska's selection as a host state. These conditions, which became part of Nebraska law, included a requirement that "the cost of disposal of low-level radioactive waste be borne by the generators of such waste." Neb.Rev.Stat. § 81–1579(2) (Reissue 1994).

Governor Orr made it clear that, while not thrilled with being the site of the facility, Nebraska would honor its commitment under the Compact. On December 24, 1987, she stated: "Although Nebraska's Commissioner voted against [locating the facility in Nebraska], the State of Nebraska recognizes its responsibility as a member of the Compact and accepts such designation as host state." (Ex. 254 at G.)

On January 29, 1988, the Commission entered into an agreement with USE, under which USE was to select a disposal site, submit a license application, and proceed with the development, construction, and operation of a facility in the State of Nebraska for the disposal of waste generated within the party states of the Compact. There have been five (5) amendments to the agreement between the Commission and USE.

### 1988 Cost Estimates & Funding Provisions

The initial estimate in the 1988 USE agreement of the cost for the completion of the prelicensing phase of the disposal facility was $13,650,000. The USE agreement authorized the Commission to establish a "Facility Review Committee" to regularly assess the feasibility of the disposal facility, reasonableness of schedules and costs, and other matters relating to the proposed disposal facility.

The USE agreement required the Commission to reimburse USE for costs necessarily incurred in the prelicensing phase of the disposal facility project, including license review and other regulatory costs charged to USE by the State of Nebraska. The Commission lacked the funds necessary to reimburse USE as required in the USE agreement. Therefore, on January 29, 1988, the Commission entered into an agreement with the waste generators to provide up to $10.1 million in the form of prepayments for future disposal services ("prepayments") so that the Commission could meet its pre-licensing financing commitments to USE. This agreement, as subsequently revised and amended, is referred to as the "Funding Agreement." Prepayments provided under the Funding Agreement were used by the Commission to meet its prelicensing payment commitments to USE under the USE agreement and to reimburse license review costs of the State of Nebraska and its contractors and consultants.

### Costs Spiral Upward

In July 1990, the generators and the Commission entered into a revised agreement to provide additional prepayments for prelicensing costs of up to $25.5 million (which included the previously provided $10.1 million). Due to escalation of the costs of the prelicensing phase of the disposal facility project, the Commission continued to request additional prepayments. Accordingly, there have been seven (7) amendments to the Funding Agreement, in July 1991, January 1992, April 1992, August 1993, July 1994, October 1997, and May 1998.

Throughout the course of the license review process, prelicensing costs have been paid as follows: The State's contractors submit invoices to the State showing their expenses for license application review costs. Then, the State adds the expenses incurred by its personnel for review of the license application and submits a monthly composite billing to USE for payment. USE then forwards to the Commission for payment the State's billing plus USE's billing (including USE subcon-

tractors) for prelicensing costs related to the license application process and State review. Finally, the Commission submits invoices to the generators, dividing the total of the month's billings from USE and the State among the generators according to their respective funding percentages from the Funding Agreement. The Commission invoices then are paid and the Commission uses the funds to reimburse USE for USE and State of Nebraska costs.

As of January 31, 1999, the plaintiff generators have advanced prepayments to the Commission under the Funding Agreement, as amended, in a total amount of approximately $74.3 million. Although it is not a party to this suit, an additional $14.7 million of prepayments has been advanced by the Nebraska Public Power District to the Commission, through January 1999. All of these prepayments have been used by the Commission to reimburse USE and the State for purported prelicensing costs related to the disposal facility project, including subcontractor and consultant costs, direct labor costs, office expenses, administrative costs, and other costs associated with the State's review of the disposal facility license application submitted by USE.

## The Regulators Apparently Violate State Law; A State Judge Decides the Health Department Has No Authority

In anticipation of the disposal facility license application by USE, the State of Nebraska, through the Nebraska Department of Environmental Quality and the Nebraska Department of Health (now known as the Nebraska Department of Health and Human Services Regulation and Licensure) established the Low–Level Radioactive Waste Program. This program constitutes the State-established procedures for management of the license application and review process.

In 1990, both state agencies entered into a Memorandum of Understanding to conduct a joint review of the disposal facility license application anticipated from USE. From the beginning, the Department of Health actively participated in the license review process despite concerns as to its legal authority expressed by the Commission and USE.

In February 1998, Judge Steven Burns of the District Court of Lancaster County, Nebraska, ruled that the Department of Health "does not have statutory authority to review, consider or rule on the license application that has been filed by U.S. Ecology for a license to construct the disposal facility designated by the Compact." (Ex. 229 (slip op. at 16).) That decision has been appealed by the State to the Supreme Court of Nebraska.

## Governor Nelson Pledges To Stop the "Nuclear Dump"; Regulators Become Unapproachable

In July 1990, USE submitted a license application to the State of Nebraska for a waste disposal facility to be located in Boyd County, Nebraska, near the village of Butte. In February and March 1991, the State provided approximately 700 comments and questions regarding the application to USE. USE responded to the comments and questions. At this time, the State followed procedures for a regular exchange of information between the Low–Level Radioactive Waste Program reviewers and the applicant, USE, during this comment and response process.

In January of 1991, E. Benjamin Nelson became Nebraska's new governor.[6] During the general election, Nelson attacked Governor Orr for doing "far too little to protect the interests and respond to the concerns of" residents who lived near the disposal site. (Ex. 241.) To a cheering crowd of local residents, Nelson promised that "[i]f I am elected governor, it is not likely that there will be a nuclear dump in Boyd County or in Nebraska." (*Id.*) His

**6.** Nelson left office as Governor in January of 1999.

remarks were reported by a veteran Associated Press journalist and the story was distributed by the AP to its many subscribers. The AP reporter, who testified at the preliminary injunction hearing, thought Nelson's remark was so unusual that he interviewed Nelson after the speech and Nelson confirmed the statement.

Kate Allen, a Nelson staffer, wrote Nelson on December 30, 1990. The memorandum was entitled "Campaign Promises." In that memorandum she wrote that "[u]pon taking office [you] will order a moratorium on further development of the facility/the current plan...." (Ex. 276.)

In July 1991, Randolph Wood became the Director of the Department of Environmental Quality. After July 1991, the State no longer followed a process involving the regular exchange of information between USE and the State's license application reviewers.

The State declared that the USE license application was complete in December 1991. After July 1991, the State changed its procedures and refused to accept USE's responses to the State's comments and questions on the license application as USE completed them. Instead, during each of the four rounds of technical review, the State insisted that no responses were to be submitted by USE until USE could respond to all of the State's comments and questions. During this technical review process, despite direct inquiries from USE, the State declined to identify corrections which it believed USE needed to make in the license application materials. These actions and procedures significantly extended the length and cost of the license review process.

### July, 1992—Regulators Disregard Recommendations of Their Auditor On Need For Budget and Timetable

In July of 1992, the State of Nebraska, through an audit conducted by Nebraska's

Auditor of Public Accounts, concluded that the Department of Environmental Quality license review program had not adopted a budget to control the cost of the license review work, and had not developed a timetable with established goals to complete the work. (Ex. 230 at 10–12.) The State Auditor recommended the adoption of a budget[7] and a timetable. (*Id.*) The State Auditor made additional recommendations that the State amend its contract with the State's primary contractor, HDR Engineering, Inc., to control costs. (*Id.* at 13–14.) These recommendations, and similar recommendations by the State Auditor in subsequent reports, were not followed by the department.

Director Wood wrote the auditor and stated "I cannot emphasize too strongly that to commit to a budget and a schedule would do significant harm to the credibility of our process and decisions." (Ex. 501 at 6.) In so doing, Wood rejected the auditor's observation that the Nuclear Regulatory Commission had developed a guideline indicating that a license review should be completed within a 15–month time frame utilizing approximately 16,640 person hours.

### 1993—USE Responds To Questionable Site Suitability Concerns

In a lengthy legal opinion dated October 1, 1991, the law firm of Collier, Shannon & Scott of Washington D.C., advised Nebraska regarding a concern expressed by the Director of the Department of Environmental Quality. Collier–Shannon[8] is counsel for the defendants in this case, and was then representing Nebraska as outside regulatory counsel.

The Director had been concerned about "siting U.S. Ecology's low-level radioactive waste disposal site in an area where wetlands and floodplains exist" because he was concerned that such an action would

---

**7.** As the auditor noted, the absence of a department budget "is the equivalent of a blank check signed by the ratepayers." (*Id.* at 11.)

**8.** The firm name is now Collier, Shannon, Rill & Scott.

"violate the site suitability requirements of Nebraska's regulations for the disposal of low-level radioactive wastes." (Ex. 259 at 1.) Counsel advised Nebraska that "[b]ased on an analysis of the language and intent of the applicable regulation, it appears that Nebraska's site suitability requirements would not be violated if U.S. Ecology's disposal facility were to be located as proposed." (*Id.*)

Nevertheless, in January 1993, the Department of Health and the Department of Environmental Quality jointly issued a Notice of Intent to Deny the USE license application, based on the alleged failure to meet site suitability requirements, including the presence of wetlands within the disposal site boundaries. At the preliminary injunction hearing, Wood was asked to explain why he did not follow the advice of the Collier–Shannon law firm. Incredibly, Wood stated that he read two sentences of the regulations and came to a different conclusion. Wood did not explain why an opinion was sought from counsel if Nebraska had no intention of following the opinion. Wood is an engineer by profession.

In any event, USE initiated a "contested case" under Nebraska administrative procedure law to challenge this Notice of Intent to Deny. In August 1993, in response to the State's Notice of Intent to Deny regarding alleged "wetlands" within the disposal site boundaries, USE filed an amended license application for the Boyd County disposal site that did not include the purported wetlands. USE also dismissed its petition for a contested case hearing and both state agencies continued to review the amended USE license application.

### March of 1995—The Regulatory Slow Down

In March 1995, the Department of Environmental Quality directed HDR, the State's primary contractor hired to provide professional services for the technical review process, to reduce by 25% all billings (and thus work) for license review activi-

ties, including those of HDR subcontractors. (Ex. 207.) The department claimed there was insufficient cash flow to pay for the license review activities.

The slow down was directed by the department when the Commission refused to advance to the department federally provided "rebate" funds, without a proper accounting from the department as to the use of those funds. (As discussed later, the Nelson administration used a part of the rebate funds to pay the salaries of Nelson staffers who worked against the license application.) The rebate funds were provided to the Commission under federal statute by the United States Department of Energy from disposal surcharges collected from generators of waste, including the plaintiff-generators. The State later sued the Commission to obtain these rebate funds. This litigation was settled between the Commission and the State, with the State promising to accelerate license review activity upon receipt from the Commission of a portion of the rebate funds.

### July of 1995—Regulators Represent They Need One More Year, But, After that Year Expires, the Job is Unfinished

Through 1994, there were four rounds of technical review by the State of Nebraska. During this time, there were 1,791 comments by the State on the Safety Analysis Report component of the license application; 425 comments on the Environmental Report component of the license application; and 402 open comments by State reviewers. US Ecology had, during this time, provided 2,216 responses to the State reviewers. In June 1995, USE submitted final responses to the State's remaining 402 open comments. On June 14, 1995, USE submitted Revision 8 to the safety report. This revision constituted the last remaining information for a final application document.

On July 26, 1995, the Department of Health and the Department of Environ-

mental Quality jointly issued a letter to USE acknowledging receipt of the final application for review, stating that final review activity had commenced, estimating that the State's final review activities would take approximately one year to complete, and declaring that the State would accept no additional information or communication from USE. (Ex. 232.)

The State of Nebraska did not complete final review activity within approximately one year, as it had stated it would in the July 26, 1995 letter. Instead, in a letter dated August 26, 1996, Director Wood stated that it was the Department's "best estimate" that a Draft Environmental Impact Assessment and Draft Safety Evaluation Report, the two key State license review documents, would be completed and ready for public review in October, 1997. (Ex. 233.)

### Refusal to Follow a Timetable Forces the Commission to Set a Deadline

From the beginning of the license review process, USE and the Commission made repeated requests for the State to adopt and follow a license review schedule. The State, through the Department of Health and the Department of Environmental Quality, declined to do so. Instead, beginning in June 1994, the Department of Environmental Quality published a series of "Management Plans" relating to the license review process. These Management Plans estimated various dates during 1996 by which the State would issue the draft safety and environmental reports. The Department of Environmental Quality Management Plan 7, issued in January 1996, however, contained no date at all for the completion of the draft safety report or the draft environmental report.

On August 27, 1996, the Commission convened a special meeting to gather information so that it could determine an appropriate schedule for the State to complete its license review activities. The Commission invited the directors of both state agencies to provide input on a license review schedule. The directors declined to participate in the Commission proceeding and refused to provide information requested by the Commission. At the August 27, 1996, Commission meeting, evidence was submitted showing that the license review process should be completed and the draft reports and preliminary licensing decision issued by December 31, 1996.

On September 3, 1996, the Commission, on a 4–1 vote with Nebraska's representative dissenting, passed a motion that established January 14, 1997, as the deadline by which the State of Nebraska was to issue the draft reports and draft license decision. Over the objection of the Nebraska's Commissioner, the Commission passed a second motion stating that a single, consolidated period should be established by the state agencies for public hearing and comment.

The State of Nebraska did not meet the January 14, 1997, deadline established by the Commission, but instead filed suit against the Commission in this court to invalidate the license review deadline. Judge Urbom ruled that the Commission had the authority to set the deadline and that the deadline was reasonable. *State of Nebraska v. Central Interstate Low–Level Radioactive Waste Commission*, 4:96CV3438 (D.Neb., Oct., 15, 1998). Accordingly, he dismissed Nebraska's suit. In his opinion, Judge Urbom stated:

> I note here that the State certainly did not help itself when the directors of NDEQ and NDOH denied the Commission's invitation to attend the information gathering meeting on August 27, 1996. The State also did not help its cause by failing to provide answers to the specific questions asked by the Commission with respect to the State's progress on processing U.S. Ecology's license application.

*Id.* slip op. at 17 n. 11. (Ex. 211.)

### October, 1997, Draft Decision: Site Location and Ground/Surface Water Conditions Are Acceptable

On October 29, 1997, the state issued a draft safety report, containing recom-

mended license conditions, and a draft environmental report, together with several supporting documents. These reports gave "acceptable" ratings to the USE license application on 123 of 152 evaluation areas.

The components of the license application that were found to be wholly acceptable included issues related to wetlands and groundwater at the proposed disposal site. Section 2.0 of the draft safety report presented 22 findings by the State regarding site location, natural and demographic features, geologic features, surface and groundwater conditions, and preoperational environmental monitoring. The State declared all of those items acceptable.

The draft safety report contained a detailed evaluation of the hydrology, both surface and ground water, for the site. For example, after 50 geologic exploratory holes, field permeability testing, water level monitoring, and laboratory analysis of borehole soil samples and groundwater samples, the report found that the closest aquifer beneath the site was at a depth greater than 1000 feet.

As for the 1000 feet of soil between the aquifer and the disposal facility during times when the soil might be saturated, the report, using a computer model, concluded "that there is no direct groundwater discharge to the surface within the proposed site." (Ex. 511 at 2–33.) In particular, and agreeing with USE, the report stated: "Model results show that the water table does not intercept the relocated swale or east ditch under high groundwater conditions, such as those occurring in 1992–94. Therefore, based on calibrated model results, an on-site groundwater to surface water pathway by direct groundwater discharge is not plausible." (*Id.* at 2–32.)

**1998—A Change of Heart**

On August 6, 1998, the Department of Environmental Quality, through Director Randolph Wood, and the Department of Health, through Dr. David Schor, announced an intent to deny USE's license application. In contrast to the State's acceptable findings in the draft safety and environmental reports, this Notice of Intent to Deny contained five negative findings related to groundwater conditions at the proposed disposal site.[9] (Ex. 235.) Such conditions were known to the State in 1993 or sooner.

In particular, the State based its proposed denial in part on groundwater data that the State had requested from USE upon the representation that the data would not be used in the technical review of the license application. In a letter dated December 17, 1996, signed by Defendant Cheryl Rogers of the Department of Health and Defendant Jay Ringenberg of the Department of Environmental Quality, the authors stated that the groundwater data obtained from USE was to be used in the State's "ongoing environmental surveillance activities, not the formal technical review." (Ex. 234.)

In addition, the proposed denial and later decision of denial also focused on the proposed relocation of a drainage swale from one portion of the site to another. This aspect of the site was contained in the original USE license application. Thus, Nebraska had known about the proposal for many years.

On December 18, 1998, the Directors of the two state agencies issued a Joint Denial of the USE license application. Governor Nelson left office shortly thereafter.

Mr. Wood testified at the preliminary injunction hearing. He tried to explain why the decision changed between 1997 and 1998. In fairness to Mr. Wood, I acknowledge that this is a difficult issue to

---

9. There was also a sixth reason for the denial. Despite the fact that over $74 million had been spent to prosecute the license application, Nebraska concluded that USE had not provided sufficient assurance that it could get the money to build the facility.

address in a hearing on a preliminary injunction given the technical complexity of the matter. Nevertheless, I am persuaded that there is strong evidence that the change in position may have been a pretext.

The hydrology issue is illustrative. Wood was not aware that the two program managers for the departments (defendants in this case) had assured USE in writing that certain groundwater data supplied by USE would not to be used for technical review purposes. (Ex. 234.) He therefore could not explain why both departments had taken that groundwater data supplied by USE for surveillance purposes and used it for technical review purposes even though they had promised not to do so. This is particularly troublesome because USE maintained that this data supplied to the departments came from surveillance wells that were drilled into aquifers. Therefore, USE argued that measurements from such wells could not accurately measure groundwater levels above the aquifer; that is, the pressure in the well, and the resulting water level, was driven by the aquifer and not the groundwater above the aquifer. Thus, the measurements did not accurately measure groundwater near the surface.

Moreover, in a complete change of procedure, the departments stopped using a computer model to decide whether groundwater would flow to the surface as they had earlier done in the draft safety report. Apparently, in the 1998 report, they simply "eye-balled" the data and concluded, without using the computer model they had previously employed in 1997, that groundwater could discharge to the surface. Wood tried to explain that the departments did not need the computer model once they got the new information from the wells that showed some water levels near the surface. He pointed out that the draft safety report called for additional data on this point.

Wood's testimony is seemingly contradicted by the draft and final safety reports. In the 1998 final safety report there is a reference to, and reliance upon, data from 1993 (a very wet period) and other years showing some groundwater at or near surface elevations. (Ex. 522 at 2–25, 2–26.) It is data like this 1993 data, described by Wood as new information, that Wood testified made the computer model unnecessary. However, despite Wood's testimony, this was not "new" information: the State had much of this data (e.g., 1993 and 1994 measurements showing some groundwater levels at or near surface elevations) at the time of the 1997 draft safety report, yet in the 1997 report Nebraska used the computer model to conclude that a "rising water table would not contact waste." (Ex. 511 at 2–32.) The failure to follow a consistent methodology is problematic at best, and evidence of bad faith at worst.

### 1993 Through 1998—Multiple Meritless Litigation

In addition to the litigation over the Commission's deadline, which Nebraska brought and lost before Judge Urbom, there have been five other suits that specifically warrant discussion. *See State of Nebraska, ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Commission,* 834 F.Supp. 1205 (D.Neb.1993) (Nelson and Nebraska's "community consent" claim was untimely and barred by equitable estoppel and laches), *aff'd,* 26 F.3d 77 (8th Cir.1994); *Nebraska ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Commission,* 4:CV93–3367, 1993 WL 738576 (D.Neb. Dec.3, 1993) (Nelson and Nebraska's "community consent" claim was barred by the earlier suit); *County of Boyd v. U.S. Ecology,* 858 F.Supp. 960 (D.Neb.1994) (Boyd County's and Local Monitoring Committee's [10] fraud claim against USE regarding "community consent" were barred by res judicata be-

---

10. The Boyd County Local Monitoring Committee is a creature of state statute that was supposed to represent the interests of local residents.

cause of the earlier suits by Nelson and Nebraska), *aff'd,* 48 F.3d 359 (8th Cir.), *cert. denied,* 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995); *Nebraska ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Commission,* 902 F.Supp. 1046 (D.Neb.1995) (Nebraska had no right to an additional member of the Commission); *State of Nebraska v. Central Interstate Low–Level Radioactive Waste Commission,* 29 F.Supp.2d 1085 (D.Neb.1998) (Nebraska did not have the right to veto an export license approved by a majority of the Commission).

In each instance, the suit was brought by Nebraska, or a closely related political subdivision, against the Commission or USE. Nebraska, and the closely related parties, lost every one of those cases. In general, all the suits lacked merit. In one case, Nebraska's suit was so lacking in merit that I concluded "the motion for sanctions is generally meritorious." *Nebraska ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Commission,* 4:CV93–3367, 1993 WL 738576, at * 6.[11] In another case, I observed that "Governor Nelson, the State of Nebraska and Plaintiffs in this case were 'closely related,'" *County of Boyd,* 858 F.Supp. at 970, that there appeared to be "a coordinated litigation strategy," *id.,* and "the State of Nebraska and its constituent political bodies ... are not entitled to wage what might be characterized as hit-and-run guerilla warfare by filing multiple lawsuits on the same claim in order to frustrate performance of the Compact." *Id.* at 974.

### The 1999 Contested Case and the State's Demand for More Money

Jay Ringenberg of the Department of Environmental Quality advised the Commission in a January 12, 1999, letter that there is a "30 day time frame (sic) for persons to challenge the ... decisions to deny the application." (Ex. 210.) Accord-

ing to Ringenberg, the license denial decisions would become final "if they are not challenged or at the end of the administrative appeals process." On January 15, 1999, USE filed petitions for a contested case hearing with both state agencies (reserving a jurisdictional challenge to the Department of Health). The Commission then joined in the action filed by USE. In short, USE and the Commission filed the "contested case" so as not to waive their rights.

In a letter dated January 5, 1999, Ringenberg informed USE of the department's cost estimate for a possible contested case proceeding, which sums would be charged to the disposal facility project. (Ex. 238.) The estimate was $650,000 for the first quarter of 1999 alone. This letter also indicated that the department expected to charge USE, as a project expense, the defense costs of this federal court lawsuit.

In another letter, dated January 25, 1999, Ringenberg demanded $100,000 from USE to pay the Local Monitoring Committee. The letter specifically threatened to suspend the "licensing process" (e.g., the contested case proceeding) if the money was not paid by February 1, 1999. (Ex. 243.)

The Local Monitoring Committee, the intended beneficiary of the $100,000, was created by state statute to represent the interests of local citizens in the area where the disposal site was to be located. According to Neb.Rev.Stat. §§ 81–15,101.01(6) and 81–15,104(1)(h) (Reissue 1994), USE was to pay the reasonable and necessary costs of the committee not to exceed $100,000 per year. As noted earlier, the Local Monitoring Committee has sued USE in the past.

There is evidence that Governor Nelson and the Local Monitoring Committee were closely allied and worked together to de-

---

**11.** I was keenly aware that an award of sanctions by a federal court might harm important state-federal relations. Accordingly, and in the presence of counsel for Nebraska, I asked the Commission and USE to withdraw their sanctions motion. They graciously agreed.

feat the license application. For example, in an October 19, 1992, letter to Loren Sieh of the Local Monitoring Committee, Governor Nelson promised Sieh that absent "community consent" the Governor would "immediately go to the Attorney General and request that he file an action in court to stop the process." (Ex. 245.) Thereafter, Nelson filed two lawsuits in this court against the Commission on the issue of "community consent" and both were dismissed. The later suit, as noted earlier, warranted the imposition of sanctions because of its duplicative character. Within months of the dismissal of the second suit, the Local Monitoring Committee filed a third suit against USE on the same issue. It too was dismissed.

According to a budget for the year of 1999 submitted by the Local Monitoring Committee, it had retained a lawyer at $3,000 per month for a total of $36,000. It also budgeted $24,550, plus allocating a certificate of deposit in an unknown amount, for "Attorney fees and/or, including but not limited to, witness fees should there be a contested case hearing regarding U.S. Ecology's License Application." (Ex. 209.) It is interesting that this budget was submitted to Director Wood on November 17, 1998, a month before the license application was denied.

After I issued the temporary restraining order, the Department of Environmental Quality advised state budget officers of the estimated future costs of the license application. Since the application had been denied, these costs could only include defense fees in this case and fees and expenses for the contested case. These costs will be passed on to the plaintiffs if injunctive relief is not granted. From now until June 30, 2000, the Department of Environmental Quality estimated that these costs will exceed $7.5 million. (Ex. 242.) Thus, if relief is not granted, the plaintiffs can expect to be hit with another huge bill.

A hearing officer, C. Thomas White, retired Chief Justice of the Nebraska Supreme Court, was appointed by both state agencies to conduct the contested case hearing. As a hearing officer, Judge White does not make a decision. On the contrary, the hearing officer merely issues a recommendation that is acted on by the agency heads.

Interestingly, Wood, then Director of the Department of Environmental Quality, wrote Governor Nelson on April 22, 1994, to discuss proposed revisions to the low-level radioactive waste regulations. Wood commented that "the decision made following the administrative contested case hearing is still made by the same person that initially made the decision which is appealed. It can and certainly has been argued that [such a procedure] is not ... unbiased...." (Ex. 1A at 2.)

Judge White scheduled a hearing for March 3, 1999, on various pending matters, including petitions for intervention by Save Boyd County Association, the Local Monitoring Committee, and Lower Niobrara Natural Resources District, all of which have opposed the proposed Boyd County disposal facility. At the hearing, the Department of Health and the Department of Environmental Quality were represented by a private law firm in which former Governor E. Benjamin Nelson is "of counsel."

Among other reasons for contesting the license denial, the Commission informed Judge White that it challenged the decision because Governor Nelson had improperly influenced the regulators and the technical reasons offered by Nebraska were a pretext. The Commission also raised a serious concern that counsel for Nebraska might be disqualified to proceed because Nelson, a member of the law firm, was an important witness. The Department of Health and the Department of Environmental Quality responded, through the law firm in which Nelson is a member, that the issue was irrelevant and that former Governor Nelson should not be subject to discovery or testimony. Judge White expressed his tentative agreement

with Nebraska. He said that "[i]f there's political influence at a higher level, it isn't going to affect—it does not necessarily involve my decision one way or another."[12] (Ex. 203 at 53:7–10.)

When told of the motion for injunctive relief and the request to stay the administrative hearing until the federal litigation could be resolved, Judge White replied, with his customary good humor, "I'm sure the Federals will advise me as to whether we are going to be doing anything at all." (*Id.* at 55:5–7.) Shortly thereafter, I granted a temporary restraining order.

### After the TRO, There is an Attempt to Construct a "Chinese Wall"

In early March of this year, at the hearing on the application for a restraining order, I expressed concern that the persons who would make the "contested case" decision were either defendants in this case or persons implicated in the bad faith alleged by the Commission. After the restraining order was issued, Nebraska's counsel advised a rapid about-face. Upon advice from their lawyers, Nebraska tried to construct a "Chinese wall" in order to respond to my concerns.

Prior to the hearing on the restraining order, Richard Nelson[13], the new Director of the Department of Health, had appointed one of the defendants in this case to make the decision for his Department. After the restraining order was issued, and upon advice from Nebraska's lawyers in

this case, Director Nelson appointed a department physician (who had treated patients in Boyd County) as the person who would make the decision for the department. Nelson wrote a letter to the doctor telling the doctor he (the doctor) would make the decision for the department and that since the doctor would be the decision maker, the doctor should have no ex parte communications in violation of Nebraska law. Director Nelson did not know who drafted the letter for his signature.

A similar shuffle took place at the Department of Environmental Quality. After the restraining order was issued, Michael Linder, the former legal counsel for the Department of Environmental Quality, was appointed Director of the Department of Environmental Quality. He had been intimately involved in the decision to deny the application.[14] He had also hired Governor Nelson's law firm to defend the department in the contested case proceeding. At the time he did so, Linder knew that former Governor Nelson, and Nelson's former chief of staff, were associated with the firm. Subsequently, and acting on advice from Nebraska's lawyers in this case, Linder appointed his water quality deputy to make the decision for the department. Linder, like Director Nelson, signed a letter making the appointment and directing the deputy not to have ex parte communications in violation of Nebraska law. Just

12. At the hearing on the temporary restraining order, I asked one of Nebraska's lawyers whether Nebraska would allow Judge White to hear evidence of bad faith. Nebraska refused. At the preliminary injunction hearing, Nebraska argued that the Commission could make an offer of proof about bad faith. Nebraska also argued that Judge White might be able to consider credibility evidence touching on bad faith. However, Nebraska continued to insist that White was prohibited from considering bad faith evidence as a substantive reason for granting the Commission relief.

13. Richard Nelson is not related to the former Governor.

14. For example, in an e-mail dated November 9, 1992, Steve Moeller, a Nelson staffer and an opponent of the facility, recounted that "Mike Linder called and gave me a heads up that the DEQ council may ask what the governor's position will be if they pass the title 194 regs [dealing with low-level nuclear waste]." (Ex. 250 at 4.) Another e-mail message dated December 31, 1992, discusses an auditor's suggestion "that there be some process for the state to resolve the site suitability [question] early in the entire licensure process." (Ex. 250 at 10.) In that message, Moeller stated that he "called Mike Linder, DEQ counsel and let him know about the substance of my telephone call with NRC [Nuclear Regulatory Commission]." (*Id.*)

like Director Nelson, Linder was unsure who drafted the letter.[15]

## Political Influence

Much of the testimony at the preliminary injunction hearing focused on the question of whether political influence had infected the eight-year license review process. Recognizing that we are at the early stages of this case, and the plaintiffs have had no discovery, the evidence is nevertheless troubling.

Former Director Wood testified. He stated that no one ever tried to influence him. He added that Governor Nelson told him to go "by the book" when deciding the application and that Nelson said he was not "winking" about that direction. Nevertheless, there is disturbing evidence that political influence was in fact visited upon the directors of the two departments who denied the application. In short, there is reason to believe that the directors made a political decision, rather than a good faith regulatory decision, to deny the license application.

Wood admitted that before he announced any important decision on the license application he would confer privately with Governor Nelson. For example, he conferred with Nelson before the January, 1993, tentative denial decision was announced, before the tentative denial decision was announced in August of 1998, and before the final denial decision was announced in December of 1998. Going "by the book" would require that these discussions not take place prior to the decision being made public, and Wood did not adequately explain why he felt it necessary to privately confer with Nelson before announcing a decision.

That Wood knew these conferences were suspicious and involved something more than a "courtesy call" is established by a 1993 e-mail. In a January 4, 1993 message, Steve Moeller, a Nelson staff member, wrote about a meeting that was to be held between Nelson and Wood. Moeller recounted that Wood "wants to make sure that if he starts getting into areas a(sic) that the governor does not want to hear concerning licensing issues that he be told to stop his presentation." (Ex. 269.) Wood and the health director had a meeting with the Governor on January 11, 1993. On January 22, 1993, Nebraska issued the first denial.

Kate Allen testified. She served Nelson in the policy research office, and one of her primary tasks was to "staff" the license application.[16] In this regard, it will be remembered that Allen wrote the "moratorium" memorandum discussed earlier.

The plaintiffs presented two very troubling pieces of evidence through Allen. Allen appeared pursuant to a subpoena. Suffice it to state that she was a very reluctant witness for the plaintiffs. Nevertheless, what she said hurt the defendants greatly.

Allen admitted that she had a meeting with the Local Monitoring Committee concerning the license application. In general, the meeting dealt with issues of water on the site, and the fact that the "LMC" wanted a meeting with Nelson to persuade him to act on their behalf. On September 2, 1992, she sent an e-mail message to her superiors reminding them that "LMC can still be used by the Governor to do things he cannot do directly" and suggesting that the Governor have the proposed meeting. (Ex. 256.) At the hearing, Allen gave a nearly incoherent explanation of what she meant by this message.

Next, Allen testified that she hand-delivered a letter to USE that was written by Randy Wood on April 15, 1991. (Ex. 508 at Ex. 8.) The letter was delivered to a

---

15. The letters signed by Directors Linder and Nelson were in all material respects identical.

16. Allen admitted that the Governor's office used rebate funds from the Commission to pay her salary. This was also true of Steve Moeller, and Allen had a hand in recruiting Moeller.

hotel room in Omaha while members of the Commission (including Nebraska's representative) and USE were negotiating with the generators for millions of dollars of additional funding. In the letter, which USE viewed as an effort to disrupt the negotiations, Wood wrote that he had "been involved in *technical briefings*" and wanted to alert USE that Wood was concerned that "wetlands and floodplains exist within the selected Boyd County site." (*Id.*, emphasis added.)

What is most troubling is not that Allen may have been trying to harm the negotiations (she denies this), but rather that she knew that Wood had been "involved in technical briefings." Allen testified that she became aware of this information, personally brought it to the attention of the Governor, and suggested that the Governor release this information to USE. The letter was then drafted. The fact that a political operative for the Governor apparently had access to sensitive "technical briefings" by the agencies involved in the review process is highly suggestive that the Nelson administration was not "going by the book" and was exerting political influence upon the agencies.

Steve Moeller, a lawyer, was also subpoenaed to testify by the plaintiffs. Moeller, like Allen, was a reluctant witness. He too served Governor Nelson at the policy research office, and he replaced Allen. Like Allen, Moeller came to personally oppose the license application.

Moeller's testimony was less dramatic than Allen's, but was just as troubling. It was also very hard to follow. Moeller would not answer questions directly, and, at other times, professed no memory of things that he should have remembered. Nevertheless, through Moeller, and a laborious process of cross-referencing various supporting e-mail messages and related documents, the plaintiffs established, at least preliminarily, that Moeller "pulled the plug" on an opinion from the Nebraska Attorney General that might have helped USE.

In November of 1992, there was a dispute between the Department of Health and the Department of Environmental Quality. The dispute regarded whether USE could "engineer around" site suitability problems. The Department of Health took the position that an engineering solution was not acceptable, and the Department of Environmental Quality took the position that such a solution was fine. The Governor's office knew of this dispute and so Moeller became involved.

To solve the dispute, a legal opinion was requested from the Nebraska Attorney General. Linda Willard, the assistant attorney general defending this case, was assigned to draft the opinion. Moeller called Willard and asked her about the opinion. In an e-mail message to a senior member of the Nelson administration dated November 9, 1992, Moeller reported that:

> I called LINDA WILLARD and she said that she was nearly done with the opinion. I asked her if she could hold off a couple days in issuing it. She said she would ask Steve Graz if that was ok. She said it was nearly done and was due to be completed last [F]riday. I asked her what the opinion said and she said that it concludes that there is a legal basis for the DEQ's position and that it is a defensible (sic) position. I feel that I should call DEQ and let them know about my request. Let me know what you think. Thanks.

(Ex. 250 at 1 (capital letters in original).)

On November 20, 1992, Moeller informed a senior member of the Nelson administration that "we should be prepared to send out marching orders as to what role both agencies have in the licensereview (sic)." (Ex. 263 at 1.) By January 4, 1993, the marching orders had apparently been issued and heard loud and clear. On that day, Moeller wrote that "Randy Wood ... stated that he was ready to sit down and talk with the Governor ... whatever differences that DOH and DEQ

had concerning their siting regs. is solved." (Ex. 269.) On January 11, 1993, the meeting with "DOH and DEQ" and the Governor was held. As noted previously, the application was tentatively denied on January 22, 1993, and USE was forced to reconfigure the application. The legal opinion that Willard had drafted supporting "DEQ's position" and, apparently that of USE, was never issued.

## II. Discussion

I will grant the Commission's motion. The other plaintiffs have stated that if I grant the Commission's motion they withdraw their motions. Accordingly, I concentrate here on the reasons why the Commission's preliminary injunction motion must be granted.

### A. Subject Matter Jurisdiction Exists

■ This court has subject matter jurisdiction over the Commission's claims under the federal question statute. 28 U.S.C. § 1331. An interstate compact, like this one, is a federal law. *See, e.g., Cuyler v. Adams,* 449 U.S. 433, 440, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981) ("the consent of Congress transforms the States' agreement into federal law under the Compact Clause."); *County of Boyd,* 48 F.3d at 361 ("An interstate compact is a creature of federal law.") (citing *Cuyler*). The Compact provides "[e]ach party state has the right to rely on the good faith performance of each other party state." Compact, Art III(f). This case involves the question of whether Nebraska breached this clear duty of good faith. The Compact also specifically directs that the Commission "shall ... [r]equire all party states and other persons to perform their duties and obligations arising under this compact by an appropriate action" in court. Compact, Art. IV(m)(8). Accordingly, federal question jurisdiction is present to review the Commission's claims.

### B. Application of *Dataphase*

In *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981), the court, sitting *en banc,* clarified the standard district courts should apply when considering a motion for preliminary injunctive relief:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase,* 640 F.2d at 114. "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998).

> At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined....
>
> .    .    .    .    .
>
> [W]here the balance of other factors tips decidedly toward [movant] a preliminary injunction may issue if [movant] has raised questions so serious and difficult as to call for more deliberate investigation.

*Dataphase,* 640 F.2d at 113–14.

#### 1. Irreparable Harm

■ The Commission will suffer irreparable harm unless I preserve the status quo. In this regard, I emphasize that if I grant injunctive relief the situation remains the same; that is, the license will remain defeated and litigants, as is customary, will pay their own fees (at least until the litigation comes to an end).

In this case, there are two components of irreparable injury. Either one is sufficient to justify injunctive relief.

First, unless I act, the defendants will charge USE, and USE will then charge the Commission (and ultimately the generators), with over $7.5 million in fees and costs. While the loss of money is not

normally indicative of irreparable injury, it is here. The defendants assert, and it is an open question whether, the Eleventh Amendment prohibits the award of damages against the defendants. If they are right, the Commission may never recoup the $74 million "plus" that has already been spent or the $7.5 million the defendants now seek to appropriate. Moreover, by shifting the defendants' fees to the Commission, the defendants enable themselves to spend any money they want in order to defeat this suit knowing that the Commission will be required to foot the bill.

Second, the Commission will be irreparably harmed if I do not stop the contested case.[17] At the heart of this federal litigation is the question of whether the entire licensing process, including the contested case proceeding, is a fraud under federal law (the Compact). If, for example, the contested case proceeding is nothing more than a "show trial"[18] where Nebraska "wins" a decision justifying the denial, difficult preclusion questions arise in this case. See, e.g., County of Boyd, 48 F.3d at 361 (discussing claim preclusion); State ex rel. Nelson, 1993 WL 738576, at * 4 (discussing claim preclusion) (citing Lane v. Peterson, 899 F.2d 737, 742 (8th Cir.1990)) (quoting Restatement (Second) of Judgments § 49 (1980)); Canal Capital Corporation v. Valley Pride Pack, Inc., 169 F.3d 508, 511–13 (8th Cir.1999) (discussing issue preclusion and Rooker–Feldman doctrine); Bechtold v. City of Rosemount, 104 F.3d 1062, 1065–66 (8th Cir.1997) (discussing issue preclusion and Rooker–Feldman doctrine).

For example, if, after the recommendation of the hearing officer, the state agencies were to conclude that their decision was not "arbitrary and capricious" would I be permitted to conclude that the defendants nevertheless violated their duty of good faith under the Compact if the evidence indicated bad faith? Would I be allowed to conclude that the scientific justification was a pretext if the evidence established pretext? This becomes an even bigger problem under the "Rooker–Feldman" doctrine and related principles of comity if the Commission later appeals the contested case to a state district judge (who apparently must review only the record made before the hearing officer). See Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). At the very least, the threat of subjecting the parties to conflicting rulings is presented by such a parallel proceeding.

Moreover, Nebraska, with the help of former Governor Nelson's new law firm, seeks to force the Commission to proceed in a non-judicial tribunal that has declared in advance that it will not hear the Commission's most basic grievance. Since Nebraska will not allow the Commission to pursue the question of bad faith in the contested case, it is inconceivable that the Commission "good faith" rights under the Compact can be protected.

An example illustrates the point. Jay Ringenberg is a defendant in this case. He was the head of the program that recommended denial of the license at the Department of Environmental Quality. He will obviously be an important witness at the contested case proceeding. Linder, as noted earlier, has been potentially im-

---

**17.** Keep in mind that it is the Commission and USE, and *not* the defendants, who are entitled to a contested case review.

**18.** As even a quick review of the facts will demonstrate, there is much evidence supporting the Commission's fear. In this regard, measures adopted by the defendants—like the "Chinese wall" they tried to put in place after the temporary restraining order was issued—are not sufficient to overcome the strong evidence of bad faith that appears to have infected the departments. It is interesting to note that, before he retired from the Nebraska Supreme Court, Nebraska's hearing officer recognized that "Chinese walls" are frequently useless. See State ex rel. Freezer Services v. Mullen, 235 Neb. 981, 458 N.W.2d 245 (1990).

plicated in the Commission's bad faith claim. He too could be an important witness. He hired Governor Nelson's firm to defend Nebraska in the contested case knowing that Nelson and Nelson's former chief of staff are part of the firm. At the hearing on the preliminary injunction, Linder testified that he and Ringenberg would direct Governor Nelson's law firm in the contested case proceeding. Thus, the law firm representing Nebraska and the two key staff members who will direct Nelson's firm all have significant *personal* reasons to make sure that the issue of bad faith is kept out of the administrative record. It is this record that Linder's deputy (and a state district judge on appeal) will review. Such a situation makes a mockery of the contested case.

I reject Nebraska's argument that "offers of proof" and the possibility of limited impeachment evidence are adequate substitutes for the Commission's *substantive* claim that the denial must be overturned because it was issued as a pretext for politics. The Compact gives to the Commission the right to enforce Nebraska's obligation of good faith, and Nebraska has no right to dilute the Compact's requirement of good faith by use of a stunted procedural mechanism.

Because of this point, I could declare · Nebraska's "contested case" law and regulations invalid under the Compact because they are inconsistent with it. The Compact declares that "[n]o party state shall pass or enforce any law or regulation which is inconsistent with this compact." Compact, Art VI(b). Also "[a]ll laws and regulations or parts thereof of any party state which are inconsistent with this compact are hereby declared null and void for purposes of this compact." Art. VI(c). A stay of the proceeding is surely preferable to a declaration that Nebraska's "contested case" scheme is inconsistent with the Compact's "good faith" requirement.

19. I have not decided that Nebraska can escape damages if it is found to have violated the Compact. I only suggest that a damage

## 2. The Balance of the Harm

The defendants will suffer no harm if I grant the injunctive relief. On the contrary, the status quo will be preserved. As noted, the license will remain denied and litigants in this court will pay their own fees. As far as delay is concerned, it took Nebraska eight years to arrive at decision to deny the application. The defendants are in no position to complain about a little more time.

## 3. Probability of Success on the Merits

The Commission is likely to prevail on the merits. In particular, the Commission is likely to win a declaration that Nebraska has acted in bad faith and therefore violated the Compact. At the very least, various equitable remedies, including an accounting, naturally flow from such a decision.[19]

### (a) There Has Been A Substantial Showing of Bad Faith

I will not detail again the strong evidence of bad faith. Summarized, that evidence includes the following: (1) Governor Nelson's campaign promise to kill the "nuclear dump" and questionable behavior by his subordinates in an apparent effort to assure that his political promise would be carried out; (2) despite the recommendations of their own auditor, the refusal of Nelson's regulators to adopt a budget and timetable potentially resulting in the waste of eight years of work and more than $74 million; (3) a 1993 decision to deny the application in the face of a legal opinion, from Nebraska's outside counsel in this case, that denial was not required by the regulations; (4) a work slow-down over a monetary dispute despite the fact that Nebraska had received millions of dollars from the Commission; (5) the 1998 decision to deny that appears inconsistent with previous positions articulated by the regulators; (6) inclusion of the Department of

award is not a precondition for the Commission becoming a prevailing party.

Health in the decision making process in violation of state law as declared by a state district judge; (7) the failure to meet a deadline adopted by the Commission and upheld by Judge Urbom; (8) repeated meritless litigation in this court; and (9) efforts by Nebraska, represented by former Governor Nelson's new law firm, to preclude the Commission from raising the issue of bad faith during the contested case.

### (b) The Eleventh Amendment Does Not Bar the Commission's Suit

While there are difficult questions about whether the Commission and the other plaintiffs can prevail on a claim for damages against Nebraska, I need not resolve that issue now. At least in part, Nebraska has waived its Eleventh Amendment immunity.

■ Among other things, the Commission requests prospective equitable relief including the appointment of an independent impartial decision maker to decide the license denial question. That relief is clearly and expressly contemplated by the Compact when it obligates ("shall") the Commission to "[r]equire all party states and other persons to perform their duties and obligations arising under this compact by an appropriate action" in a court (specifically including a federal court). Art IV(m)(8) (cross-referencing Art IV(e)). Likewise, Nebraska has an explicit duty and obligation to exercise "good faith." Art III(f) ("Each party state has the right to rely on the good faith performance of each other party state."). Reading these two provisions together, Article IV of the Compact specifically gives the Commission the authority to enforce the Article III "good faith" promise as a "duty and obligation" of a member state. To this extent, Nebraska has expressly waived its Eleventh Amendment immunity when it signed the Compact.

If Nebraska argues that I cannot look backward to determine whether to grant prospective equitable relief, Nebraska's

position is simply wrong. The Supreme Court has rejected Nebraska's argument when considering remedies for a "bad faith" violation of another compact. *Texas v. New Mexico,* 482 U.S. 124, 129, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987) (the "bad faith" failure to deliver water under a compact). The Court said: "There is nothing in the nature of compacts generally or of this Compact in particular that counsels against rectifying a failure to perform in the past as well as ordering future performance called for by the Compact." *Id.*

### (c) The Exhaustion and Abstention Doctrines Do Not Bar Suit

The doctrine of exhaustion of administrative remedies does not bar the Commission's suit. Neither does the abstention doctrine.

■ There are at least two reasons why the doctrine of exhaustion of administrative remedies does not apply. First, there is no authority that suggests when Congress adopted the Compact it intended to require the Commission to exhaust state administrative remedies as a condition for bringing a suit to enforce the good faith provisions of the Compact. (Indeed, such a requirement would be silly where, as here, the bad faith alleged by the Commission is the part of the administrative proceeding.) *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("of 'paramount importance' to any exhaustion inquiry is congressional intent") (quoting *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)). Second, "[a]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Madigan,* 503 U.S. at 146, 112 S.Ct. 1081 (quoting *West v. Bergland,* 611 F.2d 710, 715 (8th Cir. 1979)). It would be very odd to require a federally created entity like the Commission to exhaust state administrative reme-

dies under any circumstance. It would do an injustice to require exhaustion here.

As for abstention, the "federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." *Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1142 (8th Cir.1990) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 206, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988)) (in turn quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). It would be strange to enforce the abstention doctrine in favor of the defendants who have no right themselves to the state administrative proceeding and who will suffer nothing if that proceeding never takes place. USE and the Commission initiated the state proceeding so as not to waive their rights which derive from a federal compact. In short, there is no authority for invoking the abstention doctrine in this circumstance.

Moreover, abstention is particularly inapplicable here. Where, as in this case, there has been a substantial showing that the state proceeding is infected by bad faith and there is a similar showing of irreparable injury, abstention is improper. *Younger v. Harris*, 401 U.S. 37, 53, 401 U.S. 37, 27 L.Ed.2d 669 (1971) (noting exception for bad faith and irreparable injury).

### (d) The Anti–Injunction Statute Does Not Apply

The anti-injunction statute generally bars a federal court from granting an "injunction to stay proceedings in a State court" subject to certain exceptions. 28 U.S.C. § 2283. The statute does not apply to the request of the Commission. The statute applies to "proceedings in a State court." The proceeding sought to be stayed is an administrative licensing hearing and not a court proceeding. The Supreme Court of Nebraska would not regard such a proceeding as judicial in nature, particularly since the hearing officer has no power to make a decision for the agencies. *See, e.g., State ex rel. Stenberg v. Murphy*, 247 Neb. 358, 367, 527 N.W.2d 185, 193 (1995) ("State agencies may perform functions of a judicial, quasi-judicial, or factfinding character; however, such agencies are extrajudicial bodies, not courts, judges, judicial bodies or officers. The proceedings of such agencies are not judicial and are without judicial effect.") (citations omitted). Accordingly, the anti-injunction statute does not apply to what is no more than a continuation of the licensing process. *See, e.g., American Motors Sales Corp. v. Runke*, 708 F.2d 202, 204 (6th Cir.1983) (anti-injunction statute did not prohibit federal court from enjoining administrative proceedings intended to revoke license to distribute automobiles under Kentucky law because those proceedings were not judicial).

### 4. The Public Interest

The public interest includes not only the citizens of Nebraska who oppose the waste disposal facility but also the citizens of Kansas, Oklahoma, Arkansas, and Louisiana. Under the Compact, all of these states, and their citizens, had an explicit right to expect that Nebraska would exercise good faith. Congress also expected that Nebraska would act in good faith when it consented to the Compact. Preserving the status quo until the good faith issue can be litigated will further the public interest.

### III. Conclusion

The equities tip heavily in favor of the Commission. An injunction is needed.

IT IS ORDERED that:

1. The Commission's motion for a preliminary injunction (filing 59) is granted. The other motions for preliminary injunction (filings 34 and 55 (contained in the prayer)) are withdrawn. The Commission shall post a bond in the amount of $105.00. Such a bond is adequate within the meaning of Fed.R.Civ.P. 65(c).

2. The preliminary injunction will be issued by separate document.