**IT IS HEREBY ORDERED** that Defendant United States Fidelity & Guaranty Company's Amended Motion for Summary Judgment on Its Counterclaim Against Colony Insurance Company [253] is **GRANTED.**

**IT IS FURTHER ORDERED** that Colony will pay USF & G Seventeen Thousand Nine Hundred Thirty–Eight Dollars ($17,-938) for defense expenses incurred through July 28, 1997.

**IT IS FURTHER ORDERED** that Colony must pay one-half of litigation or settlement expenses incurred by USF & G, in connection with Pinewoods's defense stemming from the accident, from July 28, 1997 to date.

**IT IS FURTHER ORDERED** that both Colony and USF & G must contribute toward any future litigation and settlement expenses, on behalf of Pinewoods stemming from the accident, in equal shares until the each insurer has paid its applicable limit of insurance or none of the loss remains.

State of **NEBRASKA**, Plaintiff,

v.

**CENTRAL INTERSTATE LOW–LEVEL RADIOACTIVE WASTE COMMISSION,** Defendant.

No. 4:97CV3267.

United States District Court, D. Nebraska.

Nov. 23, 1998.

As Amended Nov. 25, 1998.

William M. Lamson, Jr., Lamson, Dugan Law Firm, Omaha, NE, Linda L. Willard, Attorney General's Office, Lincoln, NE, for plaintiff.

Alan E. Peterson, Shawn D. Renner, Cline, Williams Law Firm, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The State of Nebraska seeks a declaratory judgment that it has the unilateral right under an interstate compact to "veto" low-level radioactive waste export licenses even though all the other member states disagree with Nebraska and approve the licenses.[1] Deciding that Nebraska has no such right, I now issue my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). I decline to address the related question of whether Nebraska has the right to veto low-level radioactive waste import licenses because there is no "actual controversy" within the meaning of the Declaratory Judgment Act on that question. 28 U.S.C. § 2201(a).

## I. FINDINGS OF FACT[2]

I find the material facts to be these:

1. This matter concerns a resolution of issues arising under federal law and this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and under Article IV(*l*) of·the Central Interstate Low–Level Radioactive Waste Compact[3] which provides for judicial review of a final decision of the Commission by the filing of a petition in this

court within sixty (60) days after the decision.

2. Plaintiff alleges it is aggrieved by the final decisions rendered by the defendant as more specifically set out herein.

3. Venue is properly set in this judicial district pursuant to 28 U.S.C. § 1391 and Article IV(*l*) of the Central Interstate Low–Level Radioactive Waste Compact.

4. Plaintiff, the State of Nebraska, is a sovereign state of the United States of America and is a designated "host state" in that it is a party state in which a disposal facility is situated or is being developed.

5. The Central Interstate Low–Level Radioactive Waste Compact ("Compact") is an interstate compact that was entered into by Nebraska, Kansas, Oklahoma, Louisiana, and Arkansas pursuant to the Low–Level Radioactive Waste Policy Act and the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021, *et seq.* The Compact was ratified and approved by Congress on January 15, 1986. Broadly stated, the Compact is federal law, agreed to by all member states, that promotes the efficient, economic and safe management of low-level radioactive waste in the region.

6. The defendant, the Central Interstate Low–Level Radioactive Waste Commission ("Commission"), was created by the Compact; it is comprised of locally appointed representatives from each of the five member states; and it has the right to sue and be sued.

7. The Commission has the authority and responsibility to approve development and operation of a regional low-level radioactive waste disposal facility for the Compact.

8. The Commission has the authority to authorize the importation of waste not generated in the region for deposit or acceptance at a regional facility and the authority to

---

**1.** For a history of the Compact, see *Concerned Citizens of Nebraska v. United States Nuclear Regulatory Comm'n,* 970 F.2d 421 (8th Cir.1992). For an illustration of the tumultuous relationship between the Commission and the State of Nebraska, see, for example, *State of Nebraska v. Central Interstate Low–Level Radioactive Waste Comm'n,* 26 F.3d 77 (8th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 483, 130 L.Ed.2d 395 (1994).

**2.** Any finding of fact that is more properly considered a conclusion of law shall be so construed, and the reverse is true also.

**3.** See volume 2A of the Revised Statutes of the State of Nebraska (Reissue 1989), App. (BB), for the version of the Compact subject to construction in this case.

authorize the export from the region of waste generated in the region.

9. Article III(g) of the Compact and Article IV(m)(6) of the Compact deal with the issue of authorization and approvals required, and it is the interpretation of those paragraphs, along with other related language within the Compact, which forms the central issue before this court.

10. On June 25, 1997, the Commission considered the application of Cimarron Corporation to export from the Compact region low-level radioactive waste from Oklahoma, and the application of Wolf Creek Nuclear Operating Corporation of Kansas to export from the Compact region low-level radioactive waste from Kansas.

11. F. Gregory Hayden, the duly appointed representative of the State of Nebraska to the Central Interstate Low–Level Radioactive Waste Commission, voted to deny both the Cimarron and Wolf Creek applications.

12. The final vote was 4–1 in favor of approving those two applications, with all Commissioners except the Nebraska Commissioner voting to approve. The Commission declared the motions passed, granting permission for Cimarron and Wolf Creek to export low-level radioactive waste out of the Compact region.

13. On July 16, 1997, the Commission considered the applications of Entergy River Bend Station, Entergy Arkansas Nuclear One, Entergy Waterford 3, Omaha Public Power District, and Nebraska Public Power District to export low-level radioactive waste outside of the Compact region. The Nebraska Commissioner voted to deny each of these applications, but each other representative voted in favor and the Commission declared the motions passed as to each of those applications.

14. On July 15, 1998, the Commission considered the applications of Entergy Arkansas Nuclear One, Entergy Waterford 3, Entergy River Bend Station, Omaha Public Power District, Nebraska Public Power District, and Wolf Creek Nuclear Operating Corporation of Kansas to export low-level radioactive waste out of the Compact region. The Nebraska Commissioner voted to deny each of these applications, but the final vote of the Commission in each instance was a 4–1

vote in favor of approving the applications. Despite Nebraska's no vote, the Commission also declared these motions passed. In addition, the Commission, on votes of 4–0–1, Nebraska abstaining, declared export applications of the Department of Veterans Affairs Medical Center and the U.S. Department of Agriculture approved, notwithstanding the lack of Nebraska's affirmative vote.

15. As an example, the export permit granted to the Nebraska Public Power District in 1998 and authorized by majority vote of the Commission is set forth below:

Central Interstate Low–Level Radioactive Waste Commission
Authorization to Export Waste
Nebraska Public Power District
Columbus, Nebraska

is hereby authorized by the Central Interstate Low–Level Radioactive Waste Commission to export low-level radioactive waste outside the region, if such shipment of waste is otherwise lawful. Such authorization is for the period *July 1, 1998 to June 30, 1999.* This authorization by the Commission relates only to the requirements of the Central Interstate Low–Level Radioactive Waste Commission, and in no way affects any other requirement, liabilities, and responsibilities that may be applicable under any other state and federal laws and regulations.

This 15th day of July, 1998.

[Signed by] A. Eugene Crump, Executive Director

(Ex. 106.)

16. As an example, the export application that was submitted by the Nebraska Public Power District to obtain the 1998 export permit is set forth below:

Form A
Application for Non–Federal Facilities to Export Low–Level
Radioactive Waste From the Central Interstate Low–Level
Radioactive Waste Compact Region

1. Name of Company, Facility or Agency: Nebraska Public Power District, Cooper Nuclear Station

2. Mailing Address: P.O. Box 499, Columbus, NE 68602–0499

3. Person to be contacted concerning this application: Joe Kuttler

Title: Senior Radwaste Specialist
Telephone Number: 402/825–5272

4. Person responsible for waste management: Cindy L. Weers
   Title: Radiological Support Supervisor
   Telephone Number: 402/825–5958

5. Location of facility where waste is generated: Cooper Nuclear Station, Brownville, Nebraska 68321

6. Year for which application is made: July 1, 19[9]8 to June 30, 19[9]9.

7. Total volume of llrw projected to be exported for disposal during the time for which this application is made: 3,000 ft³.

8. The Commission has adopted the following application fee schedule for the fiscal year 1998–1999:

MAJOR GENERATOR—
Utility Company or 1001 Cubic Feet or greater

$56,000.00

LARGE GENERATOR—
501–1000 Cubic Feet

$ 7,000.00

SMALL GENERATOR—
500 Cubic Feet or Less

$   500.00

VERY SMALL GENERATOR/Occasional Shipper—
50 Cubic Feet or less, and only once every three years

$   125.00

---

9. The amount of fee to be submitted with this application is $56,000.00. Checks should be made payable to "Central Interstate Low–Level Radioactive Waste Commission."
The requirements of this application and any authorization issued as a result of this application relate only to the requirements of and authority of the Central Interstate Low–Level Radioactive Waste Commission established by the Central Interstate Low–Level Radioactive Waste Compact. Applicants are not relieved of any other responsibilities or liabilities arising under any state or federal laws and regulations.

 X  I hereby certify that to the best of my knowledge the information provided herein is accurate and correct and that the low-level radioactive waste for which this export authorization is expected will be packaged and shipped in accordance with applicable state and federal regulations and is acceptable for disposal at the intended facilities.

 X  I hereby certify to the best of my knowledge, this company/facility or agency will not export radioactive wastes which are subject to Central Interstate Compact export authorization requirements without obtaining such authorization.

---

Date: June 30, 1998    By: /s/ G.R. Horn
                       Title: Senior Vice President Energy Supply

For Commission use:       Approved                      ~~Disapproved~~

Reason:

By: /s/                              Date: 7–15–98
Title: Executive Director & General Counsel

(Ex. 106.)

17. The fees generated by the granting of export permits are an important source of funding for the Commission. For example, the Commission was to receive $56,000 from the granting of the July, 1998, export permit for the Nebraska Public Power District.

## II. CONCLUSIONS OF LAW

The plaintiff makes two claims. First, the plaintiff asserts that Nebraska has the right under the Compact to veto (or withhold its approval of) waste export licenses, and, in the absence of Nebraska's approval, export licenses may not be granted by the Commission. Second, the plaintiff claims that Nebraska has a similar right under the Compact to veto (or withhold its approval of) waste import licenses, and, in the absence of Nebraska's approval, import licenses may not be granted by the Commission. As earlier noted, I resolve the first issue in favor of the Commission and I decline to reach the second one.

### A. The Compact Language and Rules of Construction

I set forth next the portions of the Compact that are pertinent to this case. I then set forth the rules that govern construction of the Compact.

#### 1. The Compact Language

I presume a basic knowledge of the Compact, its structure and history. Accordingly, without further elaboration, I turn to the pertinent portions of the Compact as they relate to the issues before me.

First, the Compact empowers the Commission to decide most issues germane to the Compact by majority vote of its members.[4] The Compact states that: "Unless otherwise provided herein, no action of the commission shall be binding unless a majority of the total voting membership casts its vote in the affirmative." Compact, Art. IV(b).[5]

Second, the Compact states that low-level radioactive waste may not be imported to a regional disposal facility or exported from the Compact region without the approval of the Commission. The Compact states in pertinent part that: "Unless authorized by the commission, it shall be unlawful ... for any person ... [t]o deposit [or] accept, at a regional facility, waste not generated within the region [or][t]o export from the region, waste which is generated within the region." *Id.* Art. III(g)(1)–(3).[6]

Third, even if a majority of the Commission feels otherwise, under certain circumstances, the Compact precludes the import and export of low-level radioactive waste to or from the Compact region unless the "host state" agrees. The Compact states:

(m) The commission shall:

. . . .

(6) Notwithstanding any other provision of this compact, have the authority to enter into agreements with any person for the importation of waste into the region and for the right of access to facilities [7] outside the region for waste generated within the region. Such authorization to import or export waste requires the approval of the commission, including the affirmative vote of any host state which may be affected. *Id.* Art. IV(m)(6).

4. The Commission is comprised of voting members from each member state. Compact, Art. IV(a).

5. This portion of the Compact states in its entirety:

(b) Each commission member shall be entitled to one vote. Unless otherwise provided herein, no action of the commission shall be binding unless a majority of the total membership casts its vote in the affirmative.
Compact, Art. IV(b).

6. Article III(g) states in its entirety:

(g) Unless authorized by the commission, it shall be unlawful after January 1, 1986, for any person:

(1) To deposit at a regional facility, waste not generated within the region;
(2) To accept, at a regional facility, waste not generated within the region;
(3) To export from the region, waste which is generated within the region; and
(4) To transport waste from the site at which it is generated, except to a regional facility.
Compact, Art. III(g).

7. The word "facility" is defined in the Compact to mean "any site, location, structure, or property used or to be used for the management of waste." Art II(e). The words "management of waste" referenced in Art II(e) is defined by the Compact to mean "the storage, treatment, or disposal of waste." Art. II(j).

### 2. Rules of Construction

■ A compact like the one before me is a federal law. *Texas v. New Mexico*, 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987) (stating that "a compact when approved by Congress becomes a law of the United States"). Thus, when a question arises regarding the meaning of the law, "the starting point . . . is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). If the language of a statute is clear, "the words of the statute [are also] the end of the judicial inquiry." *Northern States Power Co. v. United States*, 73 F.3d 764, 766 (8th Cir. 1996) (citation and internal quotations omitted).

■ We do not, however, discern the meaning of statutes divorced from their context. "Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (citations omitted). In this regard, we "seek to interpret the statute in a way that includes every word and clause." *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir.1996).

■ Despite this "holistic endeavor," it is only when the statute is unclear that the court may resort to external aides, like legislative history[8] or policy arguments, to discern meaning. *See, e.g., Northern States Power Co.*, 73 F.3d at 766. As Judge Arnold has forcefully stated, "[w]e think that when, as here, the statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative." *Id.*

### B. Waste Export Licenses

■ The main issue in this case is whether a license to export waste from the region is an "agreement[ ] with a[ ] person . . . for the right of access to facilities outside the region," thus requiring "the affirmative vote" of the "host state." Nebraska, of course, argues that the veto/affirmative-approval provision of Art. IV(m)(6) applies because an export permit is explicitly covered by that Article or, alternatively, an export permit is the equivalent of an "agreement[ ] with a[ ] person . . . for the right of access to facilities outside the region." The Commission argues that a waste export permit is just that and it is not an "agreement[ ] with a[ ] person . . . for the right of access to facilities outside the region" under Art. IV(m)(6); that export licenses are authorized under Art. III(g)(3); and that export permits, like most other Commission actions, only require approval by a majority vote under Art. IV(b). For three reasons, I agree with the Commission's proposed interpretation of the Compact.

First, the full text, language, structure, punctuation and subject matter of the Compact suggest a general principle that favors the Commission. The general principle is that the majority rules. Compact, Art. IV(b). ("Unless otherwise provided herein, no action of the commission shall be binding unless a majority of the total voting membership casts its vote in the affirmative.") Any other general rule would mean that *one* member state could frustrate the *cooperative* policies of the group, and this is contrary to the stated goals of the Compact. In fact, the first purpose of the Compact is to provide the framework for a "cooperative effort." Compact, Art. I.[9] Consequently, we begin our

---

**8.** I share Justice Scalia's concern that legislative history can be particularly unreliable. *See Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring) ("If one were to search for an interpretative technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history.") (emphasis in original).

**9.** Art. I of the Compact in its entirety states:

The party states recognize that each state is responsible for the management of its nonfederal low-level radioactive wastes. They also recognize that the Congress, by enacting the Low-Level Radioactive Waste Policy Act, Public Law 96–573, has authorized and encouraged states to enter into compacts for the efficient management of wastes. It is the policy of the party states to cooperate in the protection of the health, safety, and welfare of their citizens and the environment, and to provide for and encourage the economical management of low-level radioactive wastes. It is the purpose of this compact to provide the framework for such a cooperative effort; to promote the health, safety and welfare of the citizens and the environment of the region; to limit the number of facilities needed to effec-

analysis with the understanding that Nebraska urges an interpretation of the Compact that is contrary to the general principle that the majority rules.

Second, without making an explicit exception to the general rule, the Compact grants the "Commission" the power to "authorize[ ]" a "person ... [t]o export from the region, waste which is generated within the region." Art. III(g)(3). Nothing in this section contradicts the general principle that the majority rules. Consequently, unless some other section of the Compact limits it, the "Commission" has the unambiguous power, by majority vote, to "authorize[ ]" a "person ... [t]o export" waste.

Third, contrary to the interpretation urged by Nebraska, Art IV(m)(6) of the Compact speaks about a *special* type of waste export *agreement* and not, like here, general waste export authorizations. The only way Nebraska can read Art. IV(m)(6) to give it veto power over waste export authorizations is to ignore the plain meaning of the words of that article, and, in some cases, to ignore the words altogether.

In the first sentence of Article IV(m)(6), the Commission is given "the authority to enter into *agreements* with any person ... *for the right of access to facilities* outside the region for waste generated within the region." (emphasis added). In this case, as the Nebraska Public Power District's export license illustrates (Ex. 106), the Commission did not enter into an "agreement." It simply issued a license to export. Moreover, the Commission did not grant the Nebraska Public Power District "the right of access to facilities." On the contrary, the Commission authorized only the export of waste, rather than the "right of access to facilities." In short, Nebraska urges me to ignore the entire first sentence of Article IV(m)(6).

Rather than relying upon the entirety of the Article, Nebraska concentrates on the second sentence of Article IV(m)(6), which states that: "Such authorization to ... export waste requires the approval of the commission, including the affirmative vote of any

host state which may be affected."  "Such" authorization obviously refers to the preceding sentence in Article IV(m)(6) dealing with "agreements ... for the right of access to facilities...." Since the mere right to export waste is not an "agreement[ ] with a[ ] person ... for the right of access to facilities," it follows that Article IV(m)(6), and its veto provisions, has no applicability to the licenses granted here under Article III(g).

If I were to construe Article IV(m)(6) as suggested by Nebraska, I would ignore the words "agreements ... for the right of access to facilities" and instead conclude that the second sentence of Article IV(m)(6) modifies the general power to approve waste export applications set forth in Article III(g)(3). Not only would Nebraska's construction render words of obvious importance in the first sentence of Article IV(m)(6) surplusage, but it would ignore the structural distinctions evidenced by separate articles of the Compact.

Still further, Nebraska's construction would improperly transform the word "such" in the second sentence of Article IV(m)(6) to the word "all."  Nebraska would have the word "such" mean "all" exports mentioned in the Compact, rather than the specific waste-export-facility-access agreements used in the sentence immediately preceding the word "such."  Simply put, "such" a construction is unwarranted by the plain meaning of the word.  *See, e.g., Webster's Third New International Dictionary* at 2283 (1986) (among other things, "such" means "already or just specified.")

As a fall-back position, Nebraska seems to argue that the waste export licenses are the "equivalent" of an "agreement[ ] ... for the right of access to facilities."  This argument is unpersuasive since neither the waste export license nor the application for the license provide or request a right of access to a facility of any kind. (See, for example, Ex. 106.)  At most, the exporter is allowed to remove the waste from Nebraska for a fee. Whether, and to what extent, the exporter

---

tively and efficiently manage low-level radioactive wastes and to encourage the reduction of the generation thereof; and to distribute the costs, benefits, and obligations among the party states.

It is the policy of the party states that activities conducted by the commission are the formation of public policies and are therefor public business.

has the right to deal with a facility is not assured or even mentioned in the papers. Nebraska's equivalence argument is therefore unpersuasive.

My opinion should not be misunderstood; that is, the Commission could enter into an agreement dealing with waste exports that would also be subject to the veto provisions of Article IV(m)(6). For example, the Commission could enter into an agreement for the right of access to a facility located in another region so that Nebraska exporters were assured that they could use that facility. In fact, such an agreement is in evidence. (Ex. 129, "Contract for Access to the Southeast Compact Commission's Regional Facility in Barnwell County, South Carolina.") However, the waste export permits at issue are altogether different than an agreement for access. When the Commission grants an export permit, it gives no assurances that the exporter has the right to use a facility. On the contrary, the Commission simply grants the right to export.

Nebraska also argues that sound public policy and the legislative history of the Compact compel the conclusion that a host state, like Nebraska, should have a veto over waste exports. Therefore, Nebraska suggests that I read Article IV(m)(6) to comply with its beliefs about public policy and legislative history. Applying the proper principles of statutory construction discussed earlier, I reject Nebraska's public policy/legislative history argument. The Compact is plainly understandable without resort to those external sources.

In summary, the host-state-veto provisions of Art. IV(m)(6) do not pertain to mere export licenses granted pursuant to Art. III(g).[10] The full text, language, structure, punctuation and subject matter of the Compact compel the conclusion that the Commission has properly interpreted the Compact and, therefore, Nebraska's waste export claim must be denied.

## C. Waste Import Licenses

■ Although the Commission has not granted and does not threaten to grant waste import licenses over Nebraska's objection,[11] Nebraska seeks a declaration that the host-state-veto provisions of Article IV(m)(6) would apply to waste import applications if the Commission ever contemplated approving one. I decline to reach this issue since nothing is pending or threatened regarding waste import permits, and it is especially inadvisable to make unnecessary decisions that control the future conduct of public bodies like the Commission. Stated more simply, the waste import issue does not present an "actual controversy," as required by the Declaratory Judgment Act. 28 U.S.C. § 2201(a). *See, e.g., Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646–47 (8th Cir.1993) ("The test to determine whether there is an actual controversy within the meaning of the Declaratory Judgment Act is whether 'there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' "; holding that sunken barge owner's fear of future liability was not sufficiently immediate to warrant declaratory judgment against United States that sunken river barge had been "abandoned" under the Rivers and Harbors Act; stating that "courts must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law.") (citations omitted).

IT IS ORDERED that judgment shall be entered by separate document generally providing that:

1. Judgment is entered for the defendant and against the plaintiff on plaintiff's claim for declaratory judgment regarding waste exports; the court declares that the host-state-veto provisions of Art. IV(m)(6) of the Compact do not pertain to mere export li-

---

**10.** This decision relates only to the waste export licenses appearing in the evidence and "similarly situated" licenses. In addition, the Commission also argued that if Article IV(m)(6) applies to export licenses, then Nebraska has not proven, contrary to the express requirements of the second sentence of Article IV(m)(6), that it "may be affected" by the Commission's decision. As I

have found that Article IV(m)(6) does not apply, I need not resolve this alternative argument.

**11.** In fact, the Commission's outside counsel seems, in general, to agree with Nebraska's interpretation of the Compact as it pertains to the veto power over waste import permits. (Ex. 110.)

censes granted pursuant to Art. III(g); costs are taxed to the plaintiff.

2.   Judgment is entered for the defendant and against the plaintiff on the plaintiff's claim for a declaratory judgment regarding waste imports; the court declares that there is no "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201(a); the plaintiff's waste import claim is dismissed without prejudice; costs are taxed to the plaintiff.

## JUDGMENT

IT IS ORDERED that judgment is entered as follows:

1.   Judgment is entered for the defendant and against the plaintiff on plaintiff's claim for declaratory judgment regarding waste exports; the court declares that the host-state-veto provisions of Art. IV(m)(6) of the Compact do not pertain to mere export licenses granted pursuant to Art. III(g); costs are taxed to the plaintiff.

2.   Judgment is entered for the defendant and against the plaintiff on the plaintiff's claim for a declaratory judgment regarding waste imports; the court declares that there is no "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201(a); the plaintiff's waste import claim is dismissed without prejudice; costs are taxed to the plaintiff.

