# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No.  99-2376

_____

Entergy, Arkansas, Inc.; Entergy                 *
Gulf State, Inc.; Entergy Louisiana,             *
Inc.; Wolf Creek Nuclear Operating               *
Corporation; Omaha Public Power                  *
District; Central Interstate Low-Level           *
Radioactive Waste Compact                        *
Commission,                                      *
                                                 *
        Plaintiffs-Appellees,            *
                                                 *
US Ecology, Inc.,                                *
                                                 *
        Intervenor,                      *
                                                 *
                                                 *   Appeal from the United States
      v.                               *   District Court for the District
                                                 *   of Nebraska.
State of Nebraska; Department of                 *
Environmental Quality, Nebraska;                 *
Randolph Wood; Jay Ringenberg;                   *
Nebraska Department of Health and                *
Human Services Regulation &                      *
Licensure; David P. Schor;  Cheryl               *
Rogers,                                          *
                                                 *
        Defendants-Appellants,           *
                                                 *
John Doe; Jane Doe; and Doe                      *
Companies 1-20,                                  *
                                                 *
        Defendants.                      *

_____

Submitted: January 10, 2000
Filed:   April 12, 2000
_____

Before WOLLMAN, Chief Judge, and MORRIS SHEPPARD ARNOLD and
       MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

The Central Interstate Low-Level Radioactive Waste Commission (the Commission) and Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Wolf Creek Nuclear Operating Corporation, and the Omaha Public Power District (the Utilities) brought this action against the State of Nebraska, its Department of Environmental Quality (EQ) and its Department of Health and Human Services and Licensure (HHS),[1] and several individually named state officers (collectively Nebraska). The plaintiffs alleged that Nebraska had breached obligations owed under the Central Interstate Low-Level Radioactive Waste Compact (the Compact), which Nebraska, Arkansas, Kansas, Louisiana, and Oklahoma had joined in 1986. In the Compact the states agreed to develop disposal facilities for low level nuclear waste generated within their borders, and in 1989 the Commission selected Nebraska as the host state for such a facility. The Commission and the Utilities allege that Nebraska has attempted to evade its obligations under the Compact since 1991, by delaying the decision on a license for the proposed facility and by then wrongfully denying a license. They seek injunctive relief, a declaratory judgment that Nebraska has violated its fiduciary and contractual obligations under the Compact, an accounting, compensatory and consequential damages, the removal of Nebraska from further

---

[1]HHS was previously known as the Nebraska Department of Heath. For ease of reference, the department is referred to as HHS throughout this opinion.

supervision of the licensing process and appointment of a third party to exercise supervision, and attorney fees and costs. This appeal by Nebraska is from a preliminary injunction issued by the district court[2] which enjoined the state parties from continuing with the administrative proceeding related to denial of the license for the disposal facility.[3] We affirm.

# I.

## A.

Congress passed the Low-Level Radioactive Waste Policy Act of 1980 (the Act), 42 U.S.C. § 2021b et seq. (1994) (amended 1986), "to promote the development of regional low-level radioactive waste disposal facilities." Concerned Citizens of Neb. v. U.S. Nuclear Regulatory Comm'n, 970 F.2d 421, 422 (8th Cir. 1992). Under the authority of the Act the member states entered into the Compact, which was passed as original legislation by each of the states and by Congress. See Neb. Rev. Stat. § 71-3521 (1996 Reissue) repealed by Neb. Rev. Stat. § 71-3522 (effective August 28, 1999) and Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act, Pub. L. 99-240, tit. II, sec. 222, 99 Stat. 1859, 1863 (1986) (reprinting the Compact hereinafter referred to by article). The Compact established the Commission and provided the framework for licensing a facility for the disposal of low level radioactive

---

[2]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska.

[3]Also pending in this court are appeals by Nebraska, docketed on December 17, 1999, from orders of the district court denying its motions to dismiss the claims against it. See Entergy Ark., Inc. v. Nebraska, 68 F. Supp. 2d 1093 (D.Neb. 1999), appeal No. 99-4263 and Entergy Ark., Inc. v. Nebraska, 68 F. Supp. 2d 1104 (D.Neb. 1999), appeal No. 99-4265.

waste generated in the five states. <u>See</u> Art. III <u>and</u> IV. Several provisions address performance of obligations imposed by the Compact. Each of the states has "the right to rely on the good faith performance of each other party state." Art. III.f. The state selected as the host for a disposal site is required "to process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V.e.2. The Commission is authorized to "require all party states . . . to perform their duties and obligations arising under this compact[.]" Art. IV.m.8.

After the Commission selected Nebraska as the host state for a radioactive waste disposal facility in December 1987, it contracted with intervenor US Ecology to construct and maintain the facility. Nebraska established procedures and standards for licensing the facility. Under the state regulations, US Ecology was required to pay all costs associated with licensing, <u>Neb. Rev. Stat.</u> § 81-1579(2) (1999 Reissue), but the Commission agreed to reimburse US Ecology for these costs. Through separate agreements the Commission passed these costs along to the Utilities. The licensing proceedings to date have cost more than $74 million.

US Ecology submitted its original license application for the construction of a low level radioactive waste disposal facility in Boyd County, Nebraska in 1990. The application was directed to the Low Level Radioactive Waste Program, operated by EQ and HHS. Nebraska proceeded to address some 700 questions and comments to US Ecology, all of which required a response. <u>Entergy Ark., Inc. v. Nebraska</u>, 46 F. Supp. 2d 977, 981 (D.Neb. 1999). After US Ecology responded to the open questions and comments, Nebraska declared the license application complete in December 1991. <u>Id.</u> at 982. EQ and HHS then reviewed the application and issued a Notice of Intent to Deny in January 1993. <u>Id.</u> at 983. The stated reason for the denial was "evidence of flooding, frequent ponding, and wetlands on the site, which . . . indicate[s] that the site is not generally well drained . . . contrary to minimum site characteristics." Appellee's App. II, 387.

US Ecology initiated an appeal from the denial of the facility license by opening a contested case proceeding under Nebraska law, but it later withdrew this appeal in favor of filing an amended license application. Entergy Ark., Inc., 46 F. Supp. 2d at 983. By the end of 1994, US Ecology had undergone another four rounds of technical review, in which it had addressed 1,791 comments by Nebraska on the Safety Analysis Report in the license application and 425 comments on the Environmental Report. This application was deemed complete in June 1995. Id. EQ and HHS acknowledged receipt of the completed application in July 1995 and stated that final review activity had commenced and would require approximately one year. The two departments also declared that no further information would be accepted from US Ecology. Id. at 984. In August 1996 EQ informed US Ecology that two license review documents, the Draft Environmental Impact Statement and the Draft Safety Evaluation Report, would not be completed until October 1997, more than two years after US Ecology had submitted its application. Id.

Following this announcement, the Commission met to impose a deadline for the completion of Nebraska's administrative review. It set January 14, 1997 as the deadline for action on US Ecology's license application. Nebraska then sued the Commission in federal court to contest its authority to set such a deadline. The district court's decision upholding the Commission's authority was affirmed by this court. See Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n, 187 F.3d 982, 987 (8th Cir. 1999).

Nebraska denied US Ecology's second license application in December 1998. The state asserted that the site provided insufficient depth to the water table which increased the likelihood of groundwater contamination, that engineered improvements to the site could not be considered under the applicable regulations, and that US Ecology had not demonstrated its financial ability to construct and maintain the disposal facility. Appellee's App. II, 463-77. US Ecology appealed the denial by

again initiating a contested case proceeding under Nebraska law.[4]

While US Ecology's license applications were pending, a number of unsuccessful lawsuits were brought by Nebraska, two community groups (Concerned Citizens of Nebraska and the Boyd County Local Monitoring Committee), and Boyd County. See County of Boyd v. US Ecology, Inc., 48 F.3d 359 (8th Cir. 1995) (claims barred by previous decision on community consent claim); Nebraska ex. rel. Nelson v. Central Interstate Low-Level Radioactive Waste Comm'n, 26 F.3d 77 (8th Cir. 1994) (community consent claim barred by expiration of limitations period); Concerned Citizens of Neb. v. U.S. Nuclear Regulatory Comm'n, 970 F.2d 421 (8th Cir. 1992) (no fundamental right to an environment free from radioactive contamination); Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n, 29 F. Supp. 2d 1085 (D.Neb. 1998), aff'd, ---F.3d---, No. 99-1275, 2000 WL 343485 (8th Cir. Apr. 4, 2000) (Nebraska has no veto power over export license); and Nebraska ex rel. Nelson v. Central Interstate Low-Level Radioactive Waste Comm'n, 902 F. Supp. 1046 (D.Neb. 1995) (Nebraska had no right to an additional member on the Commission). In all of these actions the plaintiffs contested some application of the Compact to Nebraska.

After US Ecology sought to appeal the denial of its amended application to construct the facility through a contested case proceeding, the Utilities filed this action and moved for a temporary restraining order and a preliminary injunction to enjoin the

---

[4]Under Nebraska law, the hearing officer who presides over the contested case proceeding is appointed by the agency head whose decision is being appealed. See Neb. Rev. Stat. § 84-913 et seq. (1999 Reissue); Slack Nursing Home v. Dept. of Social Servs., 528 N.W.2d 285, 291 (Neb. 1995). The hearing officer makes a recommendation to the agency head, who makes the final decision. That decision may then be appealed to the Nebraska district court, which reviews the decision de novo on the administrative record. See Neb. Rev. Stat. § 84-917(5)(a) (1999 Reissue). In this case, EQ and HHS appointed former Chief Justice Thomas White of the Nebraska Supreme Court to preside over the contested case proceeding.

state proceeding. The Utilities alleged that Nebraska's actions to delay approval of a facility license violated their statutory and contractual rights under the Compact, as well as their constitutional rights. They sought preliminary and permanent injunctive relief to bar further state administrative proceedings, a declaratory judgment that Nebraska had violated its obligations under the Compact, money damages, and attorney fees.

The Utilities named the Commission as a defendant, but it moved to realign itself as a plaintiff and brought a cross-claim against Nebraska for impeding the licensing of the disposal facility in violation of the state's contractual and fiduciary obligations to the Commission. The relief the Commission sought included a declaratory judgment that Nebraska had violated its obligations under the Compact, an accounting of the funds received by Nebraska in prelicensing fees, damages, the removal of Nebraska from control over the licensing process, the appointment of a third party to complete the licensing process, and attorney fees. The district court granted the Commission's motion to realign itself as a plaintiff and issued a temporary restraining order and then a preliminary injunction. The current appeal by Nebraska is from the granting of the Commission's motion for preliminary injunctive relief.[5]

B.

After a lengthy evidentiary hearing, the district court applied the Dataphase factors to the evidence and found that the Commission had demonstrated that it had a substantial likelihood of success on the merits and that it would suffer irreparable harm without injunctive relief. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). The injunction was entered against all state defendants, restraining them from taking any further action in connection with the contested case

_____

[5]The Utilities had agreed to withdraw their injunction motion if the Commission's were granted

proceeding involving US Ecology and the Commission, from collecting any funds from US Ecology, the Commission or the Utilities, and from spending any funds already collected.

The district court found bad faith on the part of Nebraska and that state officials had continuously and substantially interfered with the licensing process in order to deny a license to US Ecology. Entergy Ark., Inc., 46 F. Supp. 2d at 994. The court pointed to evidence from the hearing that Nebraska was biased against licensing any low level nuclear waste disposal facility. This included evidence of continuing interference by former Governor Ben Nelson in the licensing process. Nelson became governor in January 1991, after promising voters in Boyd County that "If I am elected governor, it is not likely that there will be a nuclear dump in Boyd County or in Nebraska." Id. at 981-82. After his election, an aide named Kate Allen wrote a memorandum to him advising "[u]pon taking office [you] will order a moratorium on further development of the facility/the current plan [referring to the Boyd County facility]." Id. at 982. The former director of the EQ, Randolph Wood, testified at the injunction hearing that Governor Nelson told him to treat US Ecology's license application fairly, id. at 990, but that he consulted privately with the governor before making key decisions. Such consultations preceded the denial of the original license application in 1993, the tentative denial of the second license application in 1998, and the final denial of the second license application in December 1998. Id. An e-mail from Kate Allen suggested to her superiors in the governor's office that the Boyd County Local Monitoring Committee, the state-funded community group opposed to the facility, could "be used by the Governor to do things he cannot do directly[.]" Id.

The governor intervened in a 1992 dispute between EQ and HHS as to whether they could consider engineered improvements to the site in determining its suitability. EQ favored that position. HHS asserted, however, that the site had to be considered in its unimproved condition. The agencies sought an opinion on the issue from the Nebraska Attorney General. When Steve Moeller, an aide to the governor, discovered

that the opinion would conclude that engineered improvements should be considered, he informed senior officials in the administration about the draft opinion and suggested that "marching orders" be given to the two agencies. Apparently believing that the draft conclusion would increase the likelihood of success for the license application, Governor Nelson met with officials from both agencies on January 11, 1993. US Ecology's initial application was denied by EQ and HHS eleven days later, and the opinion from the Attorney General was never issued. Id. at 991-992.

An opinion was also obtained from outside counsel before the denial of US Ecology's initial license application in January 1993. EQ Director Wood sought advice from Collier, Shannon & Scott[6] on whether wetlands made the Boyd County site unsuitable for the disposal of low level radioactive waste under Nebraska regulations. In a lengthy legal opinion dated October 1, 1991, Collier advised that placement of the disposal facility at the Boyd County site would not violate the regulations. Nonetheless, the January 1993 Notice of Intent to deny the license listed the presence of wetlands on the proposed site as one of the reasons for the denial. Wood explained at the evidentiary hearing that he had rejected the legal opinion because he read the regulations differently. Hearing Tr., 369-71. The district court found this explanation not credible. See Entergy Ark., Inc., 46 F. Supp. 2d at 982-83.

The district court also found bad faith in Nebraska's continuing refusal to set a budget or a timeline for the licensing process. The state auditor of Public Accounts had recommended in June 1992 that the state adopt a budget and timetable and amend its contract with the primary contractor, HDR Engineering, Inc., to control costs. These recommendations were not followed. Id. at 982. EQ and HHS represented in June 1995 that their review of US Ecology's second license application would take

_____

[6]Collier, Shannon & Scott is now Collier, Shannon, Rill, and Scott. The firm represented Nebraska as outside regulatory counsel in the administrative proceedings and continues to represent Nebraska in this case.

approximately one year to complete. Then in August 1996, they informed US Ecology that two critical review documents, the Draft Environmental Impact Assessment and Draft Safety Evaluation Report, would not be ready for public review until October 1997. Id. at 984.

The district court found further evidence of bad faith in Nebraska's 'change of heart' between the issuance of the draft reports and the denial of the second license application in August 1998. Nebraska had represented in draft reports that contamination of groundwater through contact with radioactive waste under US Ecology's plan was "not plausible."[7] Nonetheless, EQ and HHS rejected the second license application on the ground that the site would not adequately prevent groundwater contamination.[8] This assertion directly contradicted factual findings EQ and HHS had made in the draft reports.[9] Id. at 985-86. The district court found the

---

[7]Section 2.4 of the Draft Safety Evaluation Report (DSER) issued in October 1997 contains findings concerning the hydrological characteristics of the proposed site. One part of the report extensively analyzed the possibility of waste contaminating the site's groundwater and found that such contamination, even during periods of high groundwater, was "not plausible." DSER at 2-32 to 2-33.

[8]The denial of the license application listed six negative findings which implicated numerous Nebraska regulations. Five of those six findings relate to the potential contact between waste and groundwater. The sixth relates to US Ecology's financial ability to construct and maintain the facility.

[9]Findings in the second license denial directly contradict those in the DSER. Nebraska Administrative Code Title 194, Chapter 5, Section 001.01G states: "The disposal site shall provide sufficient depth to the water table that ground water intrusion, perennial or otherwise, into the waste will not occur. In no case will disposal be permitted in the zone of fluctuation of the water table." The 1997 Draft Safety Evaluation Report noted with respect to this regulation that "US Ecology concluded that, because all waste would be placed above grade, even a rising water table would not contact waste. The LLRW [Low Level Radioactive Waste] Program concurred with this position." DSER, at 2-32. In contrast, the 1998 denial of the license

reasons proffered by EQ and HHS officials for this change in their position to be not credible. Randolph Wood testified at the hearing that the change resulted from new information provided by US Ecology,[10] but the court found Wood's explanation insufficient to overcome the strong evidence that the reasons for the license denial were pretextual. Id. at 985-86. The court noted that much of the 'new' information had been known to EQ and HHS no later than 1993, that the information had been provided on the express representation that it would not be used for purposes of technical review, and that the agencies had "eyeballed" the data in making the new findings in denying the license application, instead of using the computer models employed for the draft reports. Id. at 986. The district court found the failure to follow a consistent methodology "problematic at best, and evidence of bad faith at worst." Id.

The district court made numerous other findings supporting the inference that political factors had tainted the licensing process. The court noted that HHS had continued to participate in the licensing process even after a Nebraska state court had ruled that the department did not have statutory authority to review the license application, id. at 981, that Nebraska had ordered its primary contractor to reduce license review activities following a dispute with the Commission over federal rebate funds in 1995, id. at 983, that Nebraska had engaged in continuous but unsuccessful litigation over the location of the facility in Nebraska since 1992, id. at 986-87, that Nebraska had sought to prevent any consideration of the question of political bias in the contested case proceeding, id. at 988-89, and that EQ and HHS did not appoint previously uninvolved individuals to make the final departmental decisions until after

application stated "[t]he application does not provide an adequate zone between the waste and the water table to ensure that disposal will not occur in the zone of fluctuation of the water table." Appellee's App. II, 465.

[10]Wood testified that groundwater level hydrographs provided by US Ecology in June 1998, for the years 1995, 1996, and 1997, documented groundwater near or at the surface of the site that could potentially contact waste. Hearing Tr. 409.

the temporary restraining order issued.  Id. at 989-990.[11]

The district court found that the Commission had made a sufficient showing of irreparable harm to support a preliminary injunction for two reasons:  1)  costs for the contested case proceeding and the associated litigation, projected to amount  to some $7.5 million that would be collected from US Ecology and passed on to the Commission, would likely be unrecoverable because of the Eleventh Amendment; and 2) Nebraska would likely try to use the results from the contested case proceeding to preclude consideration of issues in federal court.  Id. at 992-93.  The district court also found that the balance of harms and the public interest favored issuance of the injunction.

The district court concluded that none of the legal defenses relied on by Nebraska barred the issuance of an injunction.  See id. at 995-96.  Nebraska had waived its sovereign immunity by entering into the Compact,  exhaustion of administrative remedies was not required because the Commission's interest in immediate judicial review outweighed Nebraska's interest in administrative autonomy, abstention doctrines did not apply because the Commission had made a substantial showing of Nebraska's bad faith, and the Anti-Injunction Act, 28 U.S.C. § 2283 (1994), did not bar an injunction because the enjoined state proceeding was administrative rather than judicial.  Entergy Ark., Inc., 46 F. Supp. 2d at 995-96.

II.

Nebraska argues on appeal that the district court lacked jurisdiction over it, that

---

[11]Under Nebraska law, agency heads generally make the final decision in a contested case proceeding after receiving a recommendation from the hearing officer. See n.4 supra.  After the temporary restraining order issued, both EQ and HHS made new appointments to ensure that uninvolved individuals would make the final decisions arising from the contested case proceeding.

the Commission failed to make the necessary showing for a preliminary injunction, and that the injunction violated the Anti-Injunction Act, but it does not challenge any of the district court's factual findings. The Commission responds that Nebraska waived its sovereign immunity by entering into the Compact, that the district court had jurisdiction under Ex parte Young, 209 U.S. 123 (1908), that the injunction did not violate the Anti-Injunction Act, and that it made a sufficient showing of likelihood of success on the merits and irreparable harm to support a preliminary injunction.[12]

A.

Nebraska first argues that the claims asserted against it are barred by sovereign immunity and that it did not waive that immunity by entering into the Compact. Relying on cases such as Edelman v. Jordan, 415 U.S. 651, 673 (1974), and College Savings Bank v. Florida Prepaid Postsecondary Educational Expense Board, 119 S.Ct. 2219, 2228 (1999), Nebraska asserts that waivers of state sovereign immunity must be unequivocal and that the Compact language relied upon by the district court does not show unequivocal waiver.

The district court found that Nebraska had at least partially waived its Eleventh Amendment immunity. See Entergy Ark., Inc., 46 F. Supp. 2d at 995. It determined that Article IV.m.8 and Article IV.e of the Compact specifically waived Nebraska's sovereign immunity as to actions brought by the Commission to enforce obligations arising under the Compact. The key language of Article IV.m.8 is as follows:

> The Commission shall . . . require all party states and other persons to perform their duties and obligations arising under this compact by an appropriate action in any forum designated in section e. of Article IV[.]

Article IV.e in turn provides a means by which the Commission may enforce the

---

[12]The Utilities have filed a brief in support of the Commission's arguments.

obligations of the parties:

> The Commission may initiate any proceedings or appear as an intervenor or party in interest before any court of law, or any Federal, state or local agency, board or Commission that has jurisdiction over any matter arising under or relating to the terms of the provisions of this compact.

Since the Commission was seeking to enforce obligations under the Compact, specifically Nebraska's obligation of "good faith" under Article III.f,[13] the district court concluded that the Eleventh Amendment did not bar the action. Id. The Commission continues to rely on Articles IV.m.8 and IV.e and argues that these provisions waive Nebraska's sovereign immunity in an action such as this.

Nebraska relies on two other provisions for the proposition that the exclusive enforcement remedy for the Commission under the Compact is to revoke a state's membership or suspend its privileges:

> The Commission may, by two-thirds affirmative vote . . . revoke the membership of any party state which . . . shall be found to have arbitrarily or capriciously denied or delayed the issuance of a license or permit to any person authorized by the Commission to apply for such license or permit[,]

Art. V.g, and

> Any party state which fails to comply with the terms of this compact or fulfill its obligations hereunder, may, after notice and hearing, have its privileges suspended or its membership in the compact revoked by the Commission.

Art.VII.e.

---

[13]Article III.f provides that "Each party state has the right to rely on the good faith performance of each other party state."

It has long been recognized that a state may waive its Eleventh Amendment immunity. See College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd., 119 S.Ct. 2219, 2226 (1999). A state may waive immunity by invoking the jurisdiction of a federal court or by making a "clear declaration" of its intent to submit to such jurisdiction. See id. (internal quotation marks and citations omitted). A state does not submit to federal jurisdiction by consenting to suit in its own courts, see Smith v. Reeves, 178 U.S. 436, 441 (1900), by stating its intent to "sue and be sued," Florida Dept. of Health and Rehabilitative Serv. v. Florida Nursing Home Ass'n, 450 U.S. 147, 149 (1981) (per curiam), or even by authorizing suits against it in "any court of competent jurisdiction[.]" Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573, 578 (1946). The question here is whether the language of the Compact constitutes a "clear declaration" of consent to suit in federal court.

The nature of the Compact supports the Commission's argument, for the Compact is a Congressionally sanctioned agreement which authorizes, and indeed requires, the Commission to enforce the obligations it imposes upon party states. See College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 119 S.Ct. 2219, 2231 (1999). Nothing in the Compact states that revocation or suspension of a state's membership is the exclusive enforcement mechanism. The language in Article IV.e supports the Commission's argument that by entering into the Compact, Nebraska consented to action by the Commission to enforce the Compact in federal court: "[t]he Commission may initiate any proceedings or appear as an intervenor or party in interest before any court of law, or any Federal, state or local agency board or Commission that has jurisdiction over any matter arising under or relating to the terms of the provisions of this compact." We conclude that by entering into the Compact, Nebraska waived its immunity from suit in federal court by the Commission to enforce its contractual obligations.

The Commission also argues that there is an alternate basis for jurisdiction under Ex parte Young, 209 U.S. 123 (1908). Under Young, a party may sue a state officer

for prospective relief in order to stop an ongoing violation of a federal right. Injunctive relief remains generally available under this doctrine against continuing violations of federal law. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 269 (1997). Nebraska argues against the assertion of jurisdiction under this doctrine on two grounds: 1) rights advanced by the Commission arise only under Nebraska law and state claims may not be enforced against state officials in federal court; and 2) injunctive relief under Ex Parte Young cannot be premised upon a finding of past misconduct.

While Nebraska is correct that violations of state law cannot be enjoined by a federal court under Ex Parte Young, see Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984), the Commission is not attempting to enjoin a violation of state law. The rights that the Commission seeks to enforce are federal rights which arise under the Compact. The Compact provides that "[e]ach party state has the right to rely on the good faith performance of each other party state[,]" Art. III.f. It also requires that a state designated to host a regional processing facility "process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V.e.2. The Compact is federal law because it is a congressionally sanctioned agreement within the meaning of the Compact Clause. See U.S.Const., Art. I, § 10, cl. 3 and Carchman v. Nash, 473 U.S. 716, 719 (1985). This court has already held that this Compact is "a creature of federal law." County of Boyd v. US Ecology, Inc., 48 F.3d 359, 361 (8th Cir. 1995) (citations omitted). Nebraska's argument that the Commission is trying to enforce only state law must be rejected.

Nebraska's argument that injunctive relief under Ex Parte Young cannot be premised on proof of past misconduct by the state is similarly without merit: such relief is "is available where a plaintiff alleges an *ongoing* violation of *federal* law, and where the relief sought is *prospective* rather than *retrospective*." Idaho v. Coeur D'Alene

-16-

Tribe of Idaho, 521 U.S. 261, 294 (1997) (O'Connor, J., concurring) (emphasis in original). While the relief granted under Ex parte Young may only be prospective, proof for the claim necessitating relief can be based on historical facts, and most often will be. See, e.g., Edelman v. Jordan, 415 U.S. 651 (1974) (state had failed to provide aid within federally imposed time limits).

The district court had jurisdiction to issue its injunction. By entering into the Compact, Nebraska waived a portion of its sovereign immunity. The district court also had jurisdiction to enjoin state officers under Ex parte Young because the relief was solely prospective and because the Commission made a sufficient showing of Nebraska's ongoing violation of federal law.

B.

The relevant factors on a motion for a preliminary injunction are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." Sanborn Mfg. Co., Inc. v. Campbell Hausfield/Scott Fetzer Co., 997 F.2d 484, 485-86 (8th Cir. 1993) (citing Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "A district court has broad discretion when ruling on requests for preliminary injunctions, and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) (citation omitted).

Nebraska argues that the district court erred in issuing the preliminary injunction because the Commission has shown neither that it is likely to succeed on the merits of its claim nor that it would suffer irreparable harm if an injunction were not granted The Commission responds that it is likely to succeed on the merits and that it will be

-17-

irreparably harmed if the state administrative proceeding is not enjoined because it will not be able to recoup the costs of that proceeding and because it could be collaterally estopped by it.

The Commission asserts that it has made a sufficient showing of likelihood of success on the merits because it has shown both that Nebraska wrongfully delayed and denied US Ecology's license application in violation of its obligations under the Compact and that the district court has jurisdiction to grant the equitable relief it seeks. In response, Nebraska reiterates its jurisdictional arguments, asserting that the Eleventh Amendment bars any relief against the state of Nebraska or its officers and that the Compact only authorizes the Commission to seek relief by means of a hearing to revoke its membership.

We have already rejected Nebraska's Eleventh Amendment argument, and there is sufficient evidence in the record to support the district court's factual findings and its conclusion that the Commission has shown a likelihood of success on the merits. This includes evidence of interference in the licensing process by Nebraska's executive branch, delay and excessive expenditures fostered by the state, and the denial of the second license application on an apparent pretext.

Nebraska argues that the district court erred in finding irreparable harm. It asserts that litigation costs, even if unrecoverable, can not constitute irreparable injury and that any injury arising from issue or claim preclusion is speculative because it depends on the outcome of a proceeding that has yet to take place. The Commission responds that it is being taxed under the applicable state regulations not only with its own litigation costs, but also with those of Nebraska. This distinguishes its situation from the general American rule in which litigants are required to pay only their own

-18-

costs.[14]  The Commission further argues that the assertion of issue preclusion by Nebraska is not speculative in light of the record.

Injunctive relief is appropriate when legal process is used not to provide an impartial forum for the resolution of legal disputes, but rather to impede the exercise of federal rights.  See Dombrowski v. Pfister, 380 U.S. 479, 489-90 (1965).  Although federal courts are generally reluctant to interfere with ongoing state administrative proceedings, see Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627 (1986), the deference owed such proceedings does not apply if they are used to harass or discourage the exercise of a federal right.  See Younger v. Harris, 401 U.S. 37, 48 (1971).  Such abuse of legal process "sufficiently establish[es] the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention."  Id.  To show this type of injury, a party must show that state officers abused the legal process, either to further a forbidden purpose or to discriminate against a particular group.  See id.; see also Lewellen v. Raff, 843 F.2d 1103, 1112 (8th Cir. 1988).

The Commission has met that standard here.  The party states, the Commission, and US Ecology had the right under the Compact to fair and impartial consideration of US Ecology's license applications.  The Commission has submitted substantial evidence which tends to show that Nebraska did not provide, or intend to provide, impartial consideration of those applications.  Nebraska has instead used its administrative process wrongfully to delay and deny the license, at considerable expense to US Ecology, the Commission, and the Utilities.  Under these circumstances, the deference generally due a state's administrative proceeding does not apply.  The Commission has made a sufficient showing of Nebraska's abuse of the administrative

---

[14]See Neb. Rev. Stat. § 81-1579(2) (1999 Reissue) (requiring potential licensee to pay all costs associated with licensing).

process to demonstrate irreparable harm.

The importance of preliminary injunctive relief is heightened in this case by the likely unavailability of money damages should the Commission prevail on the merits of its claims. Relief in the form of money damages could well be barred by Nebraska's sovereign immunity. See Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261, 269 (1997). The expense of prosecuting an action through administrative proceedings does not generally constitute irreparable harm, even if unrecoverable. See FTC v. Standard Oil of Calif., 449 U.S. 232, 244 (1980) and Renegotiation Bd. v. Bannercraft Clothing Co., Inc., 415 U.S. 1, 24 (1974). Nevertheless, in a case such as this, in which costs far exceed those incident to ordinary litigation because of the conduct of one of the parties, it is appropriate to assess those costs in considering injunctive relief . All the costs of the contested case proceeding would have to be paid by US Ecology and then passed on by contract to the Commission and the Utilities. Some $74 million has already been spent, with another $650,000 projected to be spent in just the first three months of the contested case proceeding. None of these additional costs would be recoverable in the event of Nebraska's successful assertion of sovereign immunity.

The other Dataphase factors do not weigh against the preliminary injunction. The district court's finding that Nebraska would suffer no harm if the injunction were granted is not contested on appeal. The only harm posed to Nebraska seems to be the interruption in its licensing proceeding during the time between the issuance of the preliminary injunction and the resolution of the merits. Any such harm seems negligible considering the time that has already passed since US Ecology's initial license application. In a finding not challenged on appeal, the district court found that the public interest favors the issuance of the preliminary injunction, and we agree. This case affects not only Nebraska residents, but also residents of Kansas, Oklahoma, Arkansas, and Louisiana, who also have interests under the Compact.

After thorough consideration of the record and the relevant factors, we conclude that the district court did not abuse its discretion in issuing the preliminary injunction.

C.

Finally, Nebraska asserts that the district court order violated the Anti-Injunction Act. Nebraska argues that the preliminary injunction effectively operates against the Nebraska state courts because its administrative process allows for appeal to its courts under Neb. Rev. Stat. § 84-917(2)(a) (1996 Reissue). The Commission responds that the federal statute applies by its own terms only to state court proceedings, not to state administrative proceedings. The question of whether the Anti-Injunction Act applies to administrative proceedings is an issue of first impression in this circuit.

The Anti-Injunction Act provides that "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1994). Its plain language refers only to injunctions issued by federal courts "to stay proceedings in a State court." Id. While the Supreme Court has expressly declined to address whether the Anti-Injunction Act applies to state administrative proceedings, see Gibson v. Berryhill, 411 U.S. 564, 573 n.12 (1973), every circuit to have addressed the question has held that it does not. See Bud Antle, Inc. v. Barbosa, 45 F.3d 1261, 1271 (9th Cir. 1995); Kerr-McGee Chemical Corp. v. City of West Chicago, 914 F.2d 820, 824 (7th Cir. 1990); American Motor Sales Corp. v. Runke, 708 F.2d 202, 204-05 (6th Cir. 1983); and Engelman v. Cahn, 425 F.2d 954, 958 (2d Cir. 1969); see also SMA Life Assurance Co. v. Sanchez-Pica, 960 F.2d 274, 276 (1st Cir. 1992). Moreover, the purpose underlying the statute is the prevention of unnecessary friction between state and federal courts. See Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Engineers, 398 U.S. 281, 287 (1970). An injunction related to an administrative proceeding does not impact the state courts. The argument that the result of such a proceeding might end up in state court is speculative

at this point, and the injunction here does not implicate the Nebraska courts. Both the text of the statute and its purpose support the conclusion that the Act applies only to state courts and not to state administrative agencies.

Nebraska argues that the agency administering the contested case proceeding is the equivalent of a "state court" for purposes of the Anti-Injunction Act because the proceeding is judicial in nature. This argument is without merit, as shown by decisions of the Nebraska Supreme Court. Although "the exercise of discretion to grant or deny a license . . . is a quasi-judicial function[,]" Stoneman v. United Neb. Bank, 577 N.W.2d 271, 277 (Neb. 1998) (citation and internal quotation marks omitted), "[a]dministrative agencies are not courts." Nebraska ex rel. Stenberg v. Murphy, 527 N.W.2d 185, 193 (Neb. 1995) (citation omitted). "State agencies may perform functions of a judicial, quasi-judicial, or factfinding character; however such agencies are extrajudicial bodies, not courts, judges, judicial bodies or officers. The proceedings of such agencies are not judicial and are without judicial effect." Id. (citation omitted). This court can see no reason to accord greater dignity to the proceedings of a Nebraska state administrative agency than its highest court would. The Anti-Injunction Act maintains the equal dignity of the state and federal courts. Because that purpose is not thwarted here, we hold that the Act does not bar the preliminary injunction issued by the district court.

IV.

After a thorough review of the record, we conclude that the district court had jurisdiction to issue injunctive relief, that it did not abuse its discretion in issuing the injunction, and that it did not violate the Anti-Injunction Act. Accordingly, we affirm the preliminary injunction issued by the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.